JAMES L. VARILEK, Plaintiff-Appellant, v. MITCHELL ENGINEERING COMPANY *et al.*, Defendants-Appellees.

First District (3rd Division) No. 1—88—2475

Opinion filed June 27, 1990.

Philip J. Nathanson, Larry E. Weisman, and Robin R. LaFollette, both of Chicago, for appellant.

James Kirk Perrin, Mary Beth Denefe, and Robert J. Feldt, all of Chicago, for appellees.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff brought a personal injury action against defendant Mitchell Engineering Company (Mitchell), a division of Ceco Corporation, and former defendants not involved in this appeal. Mitchell filed a third-party action against the plaintiff's employer, Phalen Steel Erectors (Phalen). The former defendants were dismissed as a result of settlement agreements that they entered into with the plaintiff. The third-party action was dismissed as a result of a settlement agreement that was entered into between Phalen and the plaintiff. In Phalen's settlement agreement with the plaintiff, Phalen agreed to waive its workmen's compensation lien.

At the close of plaintiff's case in chief, the trial court granted Mitchell's motion for a directed verdict as to a willful and wanton count. The case went to the jury on plaintiff's product liability count and Mitchell's affirmative defenses of assumption of risk "and/or" misuse. The jury found in favor of plaintiff on liability and assessed his damages in the amount of $3,943,750. However, the jury also found that 63% of the plaintiff's damages were due to assumption of risk and/or misuse. Thus, the amount of plaintiff's damages to be recovered was reduced to $1,459,187.

Plaintiff filed a post-trial motion seeking a judgment notwithstanding the verdict for the full $3,943,750 in damages found by the

jury or a new trial on damages only, or a new trial on liability and damages, and costs. Mitchell filed a post-trial motion seeking a setoff for the amount of settlements reached between plaintiff and former defendants, and seeking a setoff for the amount of the workmen's compensation lien that was waived by Phelan in its settlement agreement with the plaintiff.

The trial court ruled that plaintiff was entitled to costs as the prevailing party. However, the trial court entered judgment in favor of plaintiff for zero damages on the basis that plaintiff's settlement amounts with former defendants and costs exceeded the $1,459,187 that plaintiff was to recover as a result of the reduced verdict. The trial court also ruled that the waiver amount of the workmen's compensation lien by Phalen is not to be included as part of the setoff.

Plaintiff has appealed. Plaintiff's relevant contentions are that (1) there was no evidence of assumption of risk or misuse; (2) the trial court erred in granting Mitchell's motion *in limine* barring plaintiff's expert from testifying as to inflation and real wage growth and from using actual rather than neutral numbers in computing present cash value; (3) the trial court erred in granting Mitchell's motion for a directed verdict as to the willful and wanton count; and (4) the trial court erred in applying plaintiff's award of costs as part of the setoff. Plaintiff therefore concludes that he is entitled to a judgment notwithstanding the verdict by reinstating the totality of the damages assessed by the jury, or alternatively, to a new trial on damages only, or to a new trial on liability and damages.

Mitchell has cross-appealed as to the trial court's ruling regarding the exclusion of the waiver amount of Phalen's workers' compensation lien as a setoff, and as to the trial court's ruling regarding the propriety of awarding certain items as costs. Mitchell has not appealed the jury's verdict as to liability on the product liability count.

We vacate the judgment entered in the trial court; enter judgment on the verdict in favor of the plaintiff and against Mitchell as to liability; enter a judgment notwithstanding the verdict in favor of plaintiff on Mitchell's affirmative defenses of assumption of risk and misuse; vacate all setoffs and costs; grant plaintiff a new trial on damages only; and remand for a new trial on damages only.

Plaintiff, age 32, was injured on June 5, 1979. He was employed by Phalen as a journeyman ironworker and was working on the erection of a one-story, 16- to 20-foot high, prefabricated steel building, known as the Sinnissippi Saw Mill Building, located in Oregon, Illinois. The building was about 60 feet wide and 100 feet long, with a lean-to or shed that juts out as an extension of the building.

The prefabricated parts and material for the building were manufactured and sold by Mitchell as a building kit. Plaintiff had been working on the erection of the building four or five days before the accident occurred. On the day of the occurrence, the concrete floor and the metal framework for the building had already been erected. The metal roof framework consisted of beams, trusses, rafters, eave struts, purlins and wind brace rods.

The rafters are beams that are used to support the roof. They form columns which are 20 feet apart. The 20-foot space between each column is called a bay. On one side of the building, the rafters run from west to east and are pitched, rising one inch for every 12 inches, to the center line of the roof. On the other side of the building, the rafters have the same pitch but run from east to west to the center line of the roof. A shallow peak is formed where the rafters meet at the center of the building. The pitch for the roof is slight, just enough to allow rain water to run off the roof.

The eave struts are horizontal members which make up the perimeter braces for the length of the roof, and they run from north to south. An eave strut is straight iron about 20 feet long and eight inches high. Its ends are C shaped. The top of the eave strut is a ridge about four inches wide, and the bottom is a ridge about five inches wide with an upward lip at the end.

The purlins are horizontal members that are secured to the top of the rafters and run parallel with the eave struts for the entire length of the building from north to south, and are set four feet apart. A purlin is straight iron about 20 feet long and about eight inches high. It is shaped with an outward projecting flange at the top and an inward projecting flange at the bottom. The top and bottom flanges are each three inches wide.

The wind brace rods are three-eighth inch steel rods that are about 21 feet long. There are two rods for each bay. The two rods are bolted into the rafters and run diagonally, crisscrossing underneath the purlins from one rafter column to the next rafter column in each bay. The two criss-crossing rods make an X configuration underneath the purlins for each bay. The rods are "used to plum up the iron before you put up the walls and the roof." Also, "in a nutshell, it is an attempt to make a four-cornered structure into two, three-cornered structures that are much more rigid."

The roof for the building was in the process of being installed at the time of the occurrence. The roof consists of panels that are about three feet wide and 20 feet long. The panels are made of Galvalume, which is galvanized sheet steel, and they have vertical parallel ridges

that are uniformly spaced about every 12 inches. When the panels were supplied by Mitchell, they were covered with a heavy and excessive film of oil which, according to the jury's verdict, made the panels unreasonably dangerous for their intended use, including their installation. No appeal has been taken from this aspect of the jury's verdict, and Mitchell does not argue that the unreasonably dangerous condition of the panels was not a proximate cause of plaintiff's injury.

The panels became coated with the heavy excessive oil during the manufacturing process. The oil was used to prevent damage to the coating of the material that was used to make the panels. The oil prevented scratches and rusting during the packaging, shipping and erection of the panels. Prior to the occurrence in this case, Mitchell had received complaints from other jobs about excessive oil on the panels and that the excessive oil caused the panels to be slippery. In an effort to reduce the thickness of the oil coating on the Galvalume sheet steel, Mitchell and the manufacturer of the sheet steel conducted experiments with different types of oils. There is documentary evidence that Mitchell requested the manufacturer of the sheet steel to reduce the oil surface in order to thereby reduce the "slippery condition for roofing crews." Also, Mitchell took other steps attempting to solve the problem, such as installing a squeegee bar on the roll-forming line for the sheet steel at one of its plants, and wiping excessive oil off with rags at another plant. In addition, Mitchell placed a warning label upon each bundle of panels when the panels were delivered. However, the warning label merely stated that the panels had been "lightly oiled" to protect against weather damage. The warning label also provided that "when installing panels on buildings, chicken boards or other equipment may be required for safety." In 1981, subsequent to the occurrence in this case, the problem of the heavy excessive oil on the panels was corrected by substituting the use of a vanishing oil, which dissipates when exposed to the atmosphere.

In the present case, the panels were delivered to the jobsite by Mitchell in bundles as part of the kit for the prefabricated building. A crane was used to set the bundles at various locations on the rafters and purlins. The ironworkers would then take the panels from the bundles and install them. Prior to the time that a panel was installed, fiberglass insulation, which was supplied in rolls approximately three feet wide, was glued to the eave strut on the west side of the building and stretched from west to east across the purlins up to the peak of the roof, and then down to the eave strut on the east side of the building. The insulation was then glued to the eave strut on the east side of the building.

Afterward, a panel was placed over the insulation and installed by drilling holes into the panel, eave strut and purlins, and then putting screws into the holes with an electric screw gun. The same procedure was to be followed until all of the panels would be installed. However, all the panels on one side of the roof were to be installed before panels on the other side of the roof were to be installed.

The ironworkers, working as a team of four men, began installing the insulation and panels at the north end of the structure, on the west side. They were working their way toward the south end of the structure. When the insulation was to be glued to the eave strut, the routine was for one of the ironworkers to apply the glue to the top ridge of the eave strut with a paint brush that was dipped into a glue can that resembles a small-sized paint can of a few inches in diameter. The glue can was kept on the bottom ridge of the eave strut, and it was moved along in a southerly direction during the course of applying the glue.

At the time of the accident, some rows of panels had already been installed. During the course of his work in installing the panels, plaintiff had to kneel on the panels. This resulted in there being oil on plaintiff's pants from his ankles all the way up to his knees. He also had oil on his hands from handling the panels. In addition, since plaintiff had been walking on the panels which had been installed, there was oil on the bottom of his shoes. He was wearing tennis shoes because "they had a lot better traction and you could feel what you were doing." One of the ironworker crew members testified that the oil on the panels was so heavy it was forming puddles and dripping off the eave struts.

The accident occurred when plaintiff was preparing to apply glue to the top ridge of the eave strut. To position himself for that task, he used the same procedure that he had been using all along. Plaintiff was standing, facing south, on the last panel that had just been installed. The glue can was on the bottom ridge of the eave strut, about four feet south of the southern edge of the last panel that had been installed, with the paint brush dipped in the glue can.

Plaintiff stepped off the south edge of the panel and put both feet on the flange that was at the bottom of the purlin, and while in a crouched position, he grabbed the top of the purlin and took two or three steps on the flange. At that point, he was facing south and was three or four feet from the south edge of the last panel that had been installed, and he was about six feet north of the rafter that was to the south of him. He then turned around and faced north. At that time, he had both feet on the bottom flange of the purlin, and he was

crouched over holding onto the top of the purlin.

While in that position, plaintiff wanted to distribute his weight for better balance. In order to obtain better balance, he put his left foot almost straight out about a foot and one-half, and down four to six inches, onto the rod that ran under the purlins and between the rafters. When he put his left foot onto the rod and began to shift some weight to his left foot to balance himself, his left foot slipped off the rod because of the oil on the bottom of his shoe, and he fell to the concrete floor. The fall was 16 to 18 feet. Plaintiff's next recollection is being in the Intensive Care Unit at Rockford Memorial Hospital. As a result of the fall, plaintiff's spinal cord was severed and he is a quadriplegic.

The purpose of the maneuver that plaintiff was engaging in at the time of the accident was to position himself to be able to reach over and take the paint brush from the glue can, and brush glue onto the top ridge of the eave strut for a distance of about four feet southward from the south end of the last panel that had been installed. This would have allowed the plaintiff to then go back and position himself on the last panel that had been installed and place the insulation on the part of the eave strut that was to be glued. The insulation would then have been stretched from west to east across to the peak of the roof and down the opposite side of the building.

Plaintiff testified as to the various methods ironworkers use to position themselves to brush glue onto the eave struts on these kinds of jobs. First is the method that plaintiff typically used. He was using this method at the time of the accident. Using this method, the ironworker would step off the last panel that had already been installed and step onto the bottom flange of the purlin for a few feet. The ironworker would then hold onto the purlin from a crouched position and turn around so that he would be facing the edge of the last roof panel that had been installed. He then would hold onto the purlin from a crouched position, and if there was a rod nearby that intersected the purlins, the ironworker would keep one foot on the bottom flange of the purlin and place his other foot on the rod so that he would "have both feet on something solid to keep his balance." He would step on the rod "to distribute [his] weight" and "so [that he] got good balance." Otherwise, when no rod was nearby, the ironworker would balance himself by keeping one foot on the bottom flange of the purlin and spread his feet out over the four-foot space between the purlin and the eave strut, and put his other foot on the ridge of the eave strut. The ironworker would then reach out and grab the glue brush that was in the glue can on the bottom ridge of the eave strut and

brush glue on the top on the eave strut.

A second method that ironworkers use to put glue on the eave struts is to work off the last panel that was installed. The ironworker would kneel at the edge of the panel, near the eave strut, and reach out three to four feet or as far as he could reach over an open area to apply the glue to the top of the eave strut. Plaintiff did not use this method on the day that he fell because the excessive oil on the panels made the method too precarious.

Plaintiff testified that a third method that ironworkers use for putting glue on the eave struts is for the ironworker to position himself on the eave strut itself. To use this method, the ironworker would have to place the glue can and the glue brush on the bottom ridge of the eave strut, near the area that is to be glued. The ironworker would then have to place both feet on the bottom ridge of the eave strut, and then scoot backwards one foot behind the other, and brush the glue on the top ridge of the eave strut. Plaintiff did not utilize this method because he did not feel stable with a narrow stance on the bottom ridge of the eave strut at the outside edge of the building frame. Plaintiff testified: "You were standing on just the bottom lip and your balance wasn't very good in that position, especially when you couldn't hang onto nothing."

Plaintiff testified that a fourth method that ironworkers sometimes use on these kinds of jobs requires the use of an outside scaffold. Whether an outside scaffold is used on these jobs "would depend mostly on the jobsite." An outside scaffold was not employed by the team of ironworkers in the present case because the ground around the perimeter of the building frame was not graded and was sandy. Plaintiff testified that you "couldn't use a scaffold because around the building it wasn't graded for one." Plaintiff also testified that an outside scaffold was not available at the jobsite. An inside scaffold, a scaffold that rolls on wheels inside a building, was used for the construction of the side wall frames for the building and was on the site. However, plaintiff testified that he had "never seen an inside scaffold used on a roof."

On cross-examination, plaintiff testified that he could have obtained planks from the jobsite and used planks to stand on while putting glue on the eave strut. Plaintiff was also asked on cross-examination about the possible use of chicken board. Chicken board is "kind of like a plank with little steps on it." Plaintiff testified that chicken board is used mainly for steep roofs. In addition, plaintiff testified: "We never used them on a slippery roof. I recall only using the boards once."

We first address Mitchell's arguments relating to assumption of risk. The gist of Mitchell's arguments is that plaintiff knew that he had oil on his shoes at the time that he slipped and fell, and that he subjectively knew the risk of falling, with or without oil on his shoes, when he put his foot on the rod. Mitchell states in its brief: "Ample evidence was presented to support a finding that Varilek subjectively knew, understood and appreciated the risk of falling while he attempted to balance his weight on the 3/8 inch wind brace rod over the open bay, either with or without oil on his shoes, and that he voluntarily and unreasonably proceeded to perform this high risk maneuver in spite of his subjective knowledge, understanding and appreciation of the risk."

To support its arguments Mitchell first states that in his opening statement, plaintiff's attorney informed the jury that plaintiff had prior experience with oiled roof panels, and that plaintiff's attorney implied to the jury that the plaintiff knew of the risk of falling due to the presence of oil by telling them that plaintiff chose not to stand or kneel on the panels because of the oil. Mitchell argues that these admissions by plaintiff's attorney were binding on plaintiff.

In addition, Mitchell refers to the testimony of an ironworker, Larry Boehle, a witness called by plaintiff. Boehle testified that there was a heavy film of oil on the panels. Boehle also indicated, according to Mitchell's brief, that plaintiff used tennis shoes by choice and that the reason for the choice was the need to increase traction on the panels due to the presence of the oil. Mitchell also states in its brief that Boehle testified that "visible footprints were left on the concrete floor and on the roof and they were not just his." Mitchell further states that Boehle said all the workers were aware of the oil because they had all discussed it.

Mitchell also refers to the testimony of another ironworker, David Whitmore, who was on the team that installed the panels. Mitchell points out in its brief that Whitmore testified that everything was extremely oily, there were big puddles of oil on the panels, and the oil was bad everywhere. Whitmore said that he had slipped himself and he knew that he slipped because he had oil on his shoes. Whitmore also testified that when he slipped on the oil, it was like falling into a swimming pool. It soaked into his clothing and made everything visibly black. He had to wipe his hands on his clothes, after touching the panels, to be able to use his tools. In addition, Mitchell points out that Whitmore said that the team of ironworkers worked on their knees a lot, and that their pants would become black after kneeling and would be saturated from the waist down. Mitchell continues the argument in

its brief by stating that Whitmore said that ironworkers experienced oil on roof panels on a majority of their jobs, and Whitmore said that he discussed the presence of the oil with plaintiff.

Mitchell also points out that plaintiff said he specialized in pre-engineered buildings, such as the Sinnissippi Saw Mill Building. Mitchell states that plaintiff had worked as an ironworker for 10 years, at least five of which were as a member of Phalen Steel Erectors' "A" gang, which was supposedly Phalen's best group; and that plaintiff was also a foreman one year for Area Erectors.

Mitchell further states in its brief that plaintiff knew that there was oil on the panels when they began erecting the roof. Mitchell states that plaintiff testified that he knew before his accident that it was slick on the roof, that everything he touched was oily, and that the oil got on everything. Mitchell states that "the oil allegedly adhered to any object with which it came into contact." Mitchell further states that plaintiff had oil on his pants from his knees to his ankles from kneeling on the panels, and that plaintiff also had oil on his hands and tools. Mitchell also states that plaintiff had walked on the panels that morning, including just moments before he fell. In addition, Mitchell asserts that plaintiff had alternate methods for putting glue on the strut and that the alternate methods rebut plaintiff's "claim that the method by which he chose to glue the eave strut was the only reasonably safe method which was available to him."

Mitchell also refers to the testimony of its expert witness, Roger Lee McCarthy. McCarthy has five degrees: bachelor of arts in philosophy; bachelor of science in mechanical engineering; degree of mechanical engineer; and a Ph.D. in mechanical engineering. He reconstructed the roof portion of the bay on which plaintiff was working at the time that he fell. McCarthy then placed himself on the reconstruction, at ground level, in the position he believed plaintiff was in when plaintiff fell. During his direct testimony, McCarthy was asked if he formed "an opinion, to a reasonable degree of engineering certainty as to whether the plaintiff assumed the risk of being injured in attempting to stand on the purlin and attempting to move his left foot towards the wind brace at the jobsite on June 5, 1979." McCarthy stated that he formed such an opinion. When asked his opinion, McCarthy answered: "That basically, based on his position, which he has indicated he was hunched over and looking down, he perceived the concrete was 15 foot below; he was in the process of attempting not just to place the foot on the rod, but from that position apply glue to that eave purlin. This was, in my opinion, based on that geometry and that height, a high risk maneuver."

McCarthy was then asked: "Again based on your investigation and based upon your expert opinion, would it be an acceptable alternative in your eyes, as a mechanical engineer, and based on human factors, for an ironworker simply to step across from one purlin over to the eave strut, a distance of four feet, and sort of maintain his balance on both feet while he is trying to glue the eave strut?" He answered: "I have not attempted that maneuver. However, I am comfortable having been on that geometry in saying that is another what I will call a high risk maneuver. It is meta-stable at best." When asked what he meant by meta-stable, McCarthy answered: "You can easily be made unstable. You're only marginally stable in that position."

On cross-examination, McCarthy testified that, except for not wearing hard hats, he was not aware that any of the custom and practices of ironworkers were violated by plaintiff or his co-workers at any time, including the time of the accident. McCarthy was "not aware of what the customs and practices even were." McCarthy also testified that he was never asked by Mitchell whether the product that was involved in this case was reasonably safe or unsafe for conditions. He testified: "I have not undertaken that assignment in connection with this case."

■ We believe that Mitchell's arguments would perhaps be worthy if this were an old-fashion negligence case with assumption of risk available as a defense as opposed to the present-day doctrine of comparative negligence. (See *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 119, 454 N.E.2d 197.) If this were that kind of case, the focus of whether assumption of risk is applicable would be on plaintiff's conduct in putting his foot on the rod when he knew that he had oil on his shoes. However, this is not that kind of a case. This is a product liability case. In a product liability case, whether the plaintiff assumed the risk of using the product must refer to using that aspect of the product that is alleged and proven to be unreasonably dangerous. See *Suich v. H & B Printing Machinery, Inc.* (1989), 185 Ill. App. 3d 863, 541 N.E.2d 1206.

In *Suich*, the court stated:

"Nor did the circuit court err in striking H & B's *assumption of risk affirmative defense relating to plaintiff's use of two chain hoists on one trolley.* *** [P]laintiff's actions, even if deemed improper, cannot constitute assumption of risk of a defective product under the circumstances presented here, *because the use of two hoists on one trolley in no way relates to the dangerous condition of the gantry alleged by plaintiff,*

namely, the ability to lift a load with the bases rotated." (Emphasis added.) (185 Ill. App. 3d at 872, 541 N.E.2d at 1212.) Here, that aspect of the product that was alleged and proven to be unreasonably dangerous plainly was the panels and not the rods. The issue, therefore, is whether plaintiff assumed the risk of walking on the panels when they were unreasonably dangerous because they were excessively coated with oil.

■ Assuming the risk, in the context of product liability law, means voluntarily and unreasonably proceeding to encounter a known danger. The test is subjective, in the sense that what must be considered is the state of mind of the particular plaintiff rather than that of a reasonably prudent person. However, that determination is not to be made solely on the basis of the plaintiff's own statements, but rather upon an assessment of all the facts established by the evidence. *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 430, 261 N.E.2d 305, 312; *Coty v. U.S. Slicing Machine Co.* (1978), 58 Ill. App. 3d 237, 244, 373 N.E.2d 1371, 1377; Restatement (Second) of Torts §402A (1965).

In the present case, we believe that all the facts established by the evidence are sufficient to show that when plaintiff walked on the panels to install them, he knew that the panels were excessively coated with oil and that he would retain oil on the bottom of his shoes. However, we also believe that all of the facts established by the evidence, even when viewed in the light most favorable to Mitchell, are not sufficient to show within the meaning of assumption of risk that plaintiff voluntarily walked on the panels to install them.

■ A plaintiff's acceptance of the risk is not to be regarded as voluntary where the defendant has forced upon him a choice of courses of conduct, which leaves him no reasonable alternative to taking his chances. Moreover, a plaintiff's acceptance of the risk is not to be regarded as voluntary where the plaintiff is compelled to accept the risk in order to exercise or protect a right or privilege of which the defendant had no right to deprive him. Thus, in order for the defense of assumption of risk to apply, it is necessary for the plaintiff to have had a viable election to accept the risk. (Restatement (Second) of Torts §496E (1965); see *Yankanwich v. Wharton* (Del. 1983), 460 A.2d 1326; *Arnold v. Union Oil Co.* (5th Cir. 1979), 608 F.2d 575; *Larson v. Massey-Ferguson, Inc.* (Iowa App. 1982), 328 N.W.2d 343; *Tew v. Sun Oil* (Del. Super. Ct. 1979), 407 A.2d 240; J.D. Lee & B. Lindsey, Modern Tort Law §9.10 (1988).) In Prosser & Keeton, The Law of Torts 490 (5th ed. 1984), it is stated: "The second important aspect of the defense of assumption of risk is that the plaintiff is barred from

recovery only if his choice is a free and voluntary one. \*\*\* Even where the plaintiff does not protest, the risk is not assumed where the conduct of the defendant has left him no reasonable alternative." W. Keeton, Prosser & Keeton on Torts §68, at 490 (5th ed. 1984).

The voluntariness prerequisite of assumption of risk is stated as follows in Restatement (Second) of Torts §496E and comment *c* (1965):

"§496E. Necessity of Voluntary Assumption

(1) A plaintiff does not assume a risk of harm unless he voluntarily accepts the risk.

(2) The plaintiff's acceptance of a risk is not voluntary if the defendant's tortious conduct has left him no reasonable alternative course of conduct in order to

(a) avert harm to himself \*\*\* or

(b) exercise or protect a right or privilege of which the defendant has no right to deprive him." Restatement (Second) of Torts §496E, at 576 (1965).

Comment:

"*c* The plaintiff's acceptance of the risk is not to be regarded as voluntary where the defendant's tortious conduct has forced upon him a choice of courses of conduct, which leaves him no reasonable alternative to taking his chances. A defendant who, by his own wrong, has compelled the plaintiff to choose between two evils cannot be permitted to say that the plaintiff is barred from recovery because he has made the choice. Therefore, where the defendant is under a duty to the plaintiff, and his breach of duty compels the plaintiff to encounter the particular risk in order to avert other harm to himself, his acceptance of the risk is not voluntary, and he is not barred from recovery. \*\*\* It is true likewise where the plaintiff is compelled to accept the risk in order to exercise or protect a right or privilege, of which the defendant has no privilege to deprive him. The existence of an alternative course of conduct which would avert the harm, or protect the right or privilege, does not make the plaintiff's choice voluntary, if the alternative is one which he can not reasonably be required to accept." Restatement (Second) of Torts §496E, comment *c*, at 577 (1965).

In J.D. Lee & B. Lindsey, Modern Tort Law §9.10 (1988) (formerly authored by James A. Dooley, justice of the Illinois Supreme Court), it is stated:

"§9.10.—Voluntary Exposure to Risk.

In order for the defense of assumption of the risk to apply,

it is also necessary for the plaintiff to have had an election to accept the risk, and that the decision to accept the risk have been voluntary."

In the present case, there is no question that installing the panels was part of plaintiff's job as an ironworker. It is likewise true that the only way the panels could have been installed so that they would constitute the roof of the building was for the ironworkers to walk on them. There was no other method that was feasible which would have eliminated the necessity of walking on the panels and getting oil on the ironworkers' shoes and clothing. It is clear from examining the record thoroughly that these circumstances were true whether the ironworkers had used any of the alternative methods described by the plaintiff or used scaffolding, planks or chicken boards to assist them. Moreover, since assumption of risk, even as a damage-reducing defense, is an affirmative defense, Mitchell had the burden of proof to establish otherwise and it did not do so. See *Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 119, 454 N.E.2d 197; *Suich*, 185 Ill. App. 3d at 870.

■ Under the circumstances, since the only way that the panels could have been installed to complete the roof of the building was for the plaintiff to walk on them, it is plain that the plaintiff was compelled to accept the risk of walking on the panels in order to exercise and protect his right and privilege to do his job. His only alternative was not to do his job. However, Mitchell had no right to deprive the plaintiff of exercising his right and privilege to do his job. (See Restatement (Second) of Torts §496E, comment *c* (1965).) Moreover, in situations like those in the present case, where the nature of plaintiff's employment requires exposure to certain hazards, it would be a *non sequitur* of the policy considerations of product liability law to say that the plaintiff voluntarily assumed such hazards by the mere acceptance or continuation of his job. (*Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 990-91, 326 N.E.2d 74, 87; *Coty*, 58 Ill. App. 3d at 245.) Thus, plaintiff did not voluntarily assume the risk of walking on the panels within the meaning of assumption of risk in product liability law.

■ We are cognizant that plaintiff did not introduce evidence that he would have been fired if he had refused to install the panels. However, we do not believe that such evidence was necessary to demonstrate that plaintiff's decision was not a voluntary assumption of the risk. (Compare *Streeter v. Western Wheeled Scraper Co.* (1912), 254 Ill. 244, 257, 98 N.E.2d 541.) In *Streeter*, the court held that an injured factory worker did not assume the risk of his injury, and stated:

"Notwithstanding the theoretical liberty of every person to contract for his labor or services and his legal right to abandon his employment if the conditions of service are not satisfactory, practically, by stress of circumstances, poverty, the dependence of his family, scarcity of employment, competition or other conditions, the laborer frequently has no choice but to accept employment upon such terms and under such conditions as are offered." (254 Ill. at 257.)

Likewise, we are mindful that in the competitiveness and pragmatism of the real world being fired is not the only sanction or detriment that workers suffer if they refuse to do their jobs. There are many other sanctions and detriments that are not expressed or immediately imposed that workers suffer if they choose not to do their jobs. It follows that an injured worker does not have to put in evidence that he would have been fired if he had not done his job in order to show that his decision to use the defendant's product was not voluntary under the doctrine of assumption of risk.

In sum, we hold that a product liability defendant cannot be heard to argue that an injured worker assumed the risk of his injury because he had a voluntary choice to make in that he could have chosen not to do his job. This conclusion creates no undue burden on a product liability defendant since it is under a nondelegable duty to produce or supply a product which is not unreasonably dangerous. (*Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 117, 454 N.E.2d 197, 203; *Suich v. H & B Printing Machinery* (1989), 185 Ill. App. 3d 863, 877-78, 541 N.E.2d 1206, 1216.) Moreover, if the product liability defendant does produce or supply an unreasonably dangerous product and the injured worker's employer is negligent in failing to provide a safe place to work, the product liability defendant can seek and obtain contribution against the employer. (*J.I. Case Co. v. McCartinMcAuliffe* (1987), 118 Ill. 2d 447, 462-64, 516 N.E.2d 260, 267; *Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 14, 461 N.E.2d 382; *Suich,* 185 Ill. App. 3d at 877-78.) This allows the full financial burden of the worker's injuries to be borne by the party or parties who rightfully should bear the loss, rather than having the injured worker suffer the financial loss of having his damages reduced merely because he was given a Hobson's choice.

■ In addition, considerations of public policy in work-related product liability injury cases compel the conclusions that we have reached. There is no doubt that virtually everyone in the work force of our society uses some manufactured product in the regular course of his or her job. It is likewise true that work-related product liability

injuries are ordinarily grave and often permanent and devastating to the worker and his family. Thus, socio-legal responsibilities mandate that the law sees to it that these injured workers are not unjustly deprived of recovering fully for their injuries. It follows that where a defendant's unreasonably dangerous product is a proximate cause of a worker being injured, the law cannot countenance the unjust result of reducing the amount of the worker's recoverable damages on the basis of a specious argument that he had an election and voluntarily assumed the risk of being injured by doing his job. Compare *Coty*, 58 Ill. App. 3d at 244, discussing *Bexiga v. Havir Manufacturing Corp.* (1972), 60 N.J. 402, 290 A.2d 281, and *Bahlman v. Hudson Motor Car Co.* (1939), 290 Mich. 683, 288 N.W. 309; *Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 990, 326 N.E.2d 74.

■■ ■ Since assumption of risk is an affirmative defense, Mitchell had the burden to prove that plaintiff voluntarily and unreasonably assumed the risk of using its unreasonably dangerous product. (*Coney*, 97 Ill. 2d at 119; *King v. American Food Equipment Co.* (1987), 160 Ill. App. 3d 898, 908, 513 N.E.2d 958, 964.) There is no evidence, however, that plaintiff voluntarily assumed the risk of using Mitchell's unreasonably dangerous product for the reasons that we have stated. We therefore conclude that when the evidence is viewed in the light most favorable to Mitchell, it so overwhelmingly favors plaintiff that a verdict for Mitchell on the issue of assumption of risk could never stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504; *King*, 160 Ill. App. 3d at 908.) A judgment notwithstanding the verdict on the issue of assumption of risk must therefore be entered in favor of the plaintiff and against Mitchell.

■■ We next address Mitchell's arguments relating to misuse. Misuse of a product is using it for a purpose neither intended nor reasonably foreseeable by the defendant based upon an objective standard. Like assumption of risk, misuse is an affirmative defense which operates to reduce the plaintiff's recovery by the amount of fault apportioned to him. *Suich*, 185 Ill. App. 3d at 870.

Mitchell's arguments on misuse parallel its arguments on assumption of risk in that the arguments focus on the rods. That aspect of the product which plaintiff alleged and the jury found to be unreasonably dangerous, however, was the panels and not the rods. Thus, the same analysis which we made with respect to Mitchell's arguments for assumption of risk is applicable to Mitchell's arguments for misuse. The issue as to misuse is therefore whether plaintiff misused the panels and not whether plaintiff misused the rods.

■■ There is absolutely no evidence in this case that there was

misuse of the panels. This is especially evident when we recognize that there is a distinction between the purpose for which and the manner in which a product is being used. Here, in order to prove misuse of the panels, Mitchell was required to demonstrate that the panels were used for a *purpose* neither intended nor foreseeable. The plaintiff walked on the panels to install them and so that he could complete the installation of the remaining panels, a *purpose* which was plainly intended and foreseeable by Mitchell for the completion of the roof of the building. The *manner* in which the particular purpose was being accomplished is not an issue under a theory of misuse. See *Suich*, 185 Ill. App. 3d at 872-73.

We therefore conclude that when the verdict is viewed in the light most favorable to Mitchell, it so overwhelmingly favors plaintiff that a verdict for Mitchell on the issue of misuse could never stand. A judgment notwithstanding the verdict on the issue of misuse must therefore be entered in favor of the plaintiff and against Mitchell.

■■■ Mitchell contends that plaintiff "has not argued that the trial court erred in denying his post-trial motion for judgment notwithstanding the verdict, nor has he argued that the jury's finding of 63% comparative fault is unwarranted pursuant to the standard for judgment notwithstanding the verdict," and that as a result, "he has waived the issue of whether or not he is entitled to judgment notwithstanding the verdict." We disagree with Mitchell's contention.

Plaintiff's post-trial motion, which was denied, sought a judgment notwithstanding the verdict by reinstating the totality of the damages assessed by the jury or, alternatively, to grant a new trial on damages only. In his brief on appeal, plaintiff presented extensive arguments that there was no evidence of assumption of risk or misuse and that it was error for the court to submit the issues of assumption of risk and misuse to the jury. The plaintiff's brief concludes:

> "For each and all of the foregoing reasons, plaintiff-appellant James L. Varilek, respectfully requests this court to reverse the denial of his post-trial motion and to enter judgment notwithstanding the verdict by reinstating the totality of the damages assessed by the jury, or alternatively, to grant a new trial on damages only, or alternatively, to grant a new trial on liability and damages."

Under the circumstances, we believe that plaintiff did not waive the issue of whether he is entitled to a judgment notwithstanding the verdict on the issues of assumption of risk and misuse, and as to whether he is entitled to a new trial on damages only.

We next consider plaintiff's contention that the trial court erred

in granting Mitchell's motion *in limine* to bar plaintiff's expert, Dr. Charles M. Linke, from testifying in conformity with his report regarding the present cash value of plaintiff's future lost earnings and future medical expenses and care. As a result of the trial court's ruling Linke did not testify, but plaintiff made an offer of proof and Linke's report was filed as an exhibit and made part of the record. There is no question that Linke is a qualified expert to calculate present cash value.

The trial court ruled that in testifying to present cash value, Linke was precluded from using a formula which incorporates inflation and real wage growth, and from using actual rather than neutral figures in his formula. The trial court relied upon *American National Bank & Trust Co. v. Thompson* (1987), 158 Ill. App. 3d 478, 511 N.E.2d 1206.

In their arguments relating to the propriety of Linke using inflation and real wage growth in his formula to determine present cash value, plaintiff and Mitchell give different interpretations to the following cases: *Thompson* (158 Ill. App. 3d 478, 511 N.E.2d 1206); *Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill. 2d 164, 133 N.E.2d 288; *LeMaster v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 343 N.E.2d 65; *Baird v. Chicago, Burlington & Quincy R.R. Co.* (1976), 63 Ill. 2d 463, 349 N.E.2d 413; *Stringham v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 312, 536 N.E.2d 1292; *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322; and *Raines v. New York Central R.R. Co.* (1970), 129 Ill. App. 2d 294, 263 N.E.2d 895, *rev'd on other grounds* (1972), 51 Ill. 2d 428, 283 N.E.2d 230.

After examining and reviewing all of the cases cited by the respective parties, we believe that it is plain that there are various methods that are used by competent experts to determine present cash value. This fact is illustrated in *O'Shea v. Riverway Towing Co.* (7th Cir. 1982), 677 F.2d 1194. In *O'Shea*, the court stated:

> "We come at last to the most important issue in the case, which is the proper treatment of inflation in calculating lost future wages. ***
>
> * * *
>
> There are (at least) two ways to deal with inflation in computing the present value of lost future wages. One is to take it out of both the wages and the discount rate—to say to Mrs. O'Shea, 'we are going to calculate your probable wage in 1990 on the assumption, unrealistic as it is, that there will be zero

inflation between now and then; and, to be consistent, we are going to discount the amount thus calculated by the interest rate that would be charged under the same assumption of zero inflation.' ***

An alternative approach, which yields the same result, is to use a (higher) discount rate based on the current risk-free 10-year interest rate, but apply that rate to an estimate of lost future wages that includes expected inflation. ***

Either approach to dealing with inflation is acceptable (they are, in fact, equivalent) and we by no means rule out others; but it is illogical and indefensible to build inflation into the discount rate yet ignore it in calculating the lost future wages that are to be discounted. That results in systematic under-compensation, just as building inflation into the estimate of future lost earnings and then discounting using the real rate of interest would systematically overcompensate. The former error is committed, we respectfully suggest, by those circuits, notably the Fifth, that refuse to allow inflation to be used in projecting lost future earnings but then use a discount rate that has built into it a large allowance for inflation. See, *e.g.*, *Culver v. Slater Boat Co.*, 644 F.2d 460, 464 (5th Cir. 1981) (using a 9.125 percent discount rate). We align ourselves instead with those circuits (a majority, see *Doca v. Marina Mercante Nicaraguense, S.A., supra*, 634 F.2d at 35-36), notably the Second, that require that inflation be treated consistently in choosing a discount rate and in estimating the future lost wages to be discounted to present value using that rate. See *id.* at 36-39." 677 F.2d at 1198-1200.

In addition, in the dissenting opinion in *Thompson*, it is stated:

"Almost all of our sister States have held that it is proper for the trier of fact to consider the effect inflation will have on the present cash value of future damages. (*Rodriguez v. McDonnell Douglas Corp.* (1978), 87 Cal. App. 3d 626, 662, 151 Cal. Rptr. 399, 419; *Bould v. Touchette* (Fla. 1977), 349 So. 2d 1181, 1185-86; *Richmond Gas Corp. v. Reeves* (1973), 158 Ind. App. 338, 369, 302 N.E.2d 795, 815-16; *Ossenfort v. Associated Milk Producers, Inc.* (Minn. 1977), 254 N.W.2d 672, 684; *Cords v. Anderson* (1977), 80 Wis. 2d 525, 550-52, 259 N.W.2d 672, 683-84; see generally Annot., 21 A.L.R.4th 21 (1983) (commenting that the majority of jurisdictions permit the trier of fact to consider the effects of inflation).) ***

The majority opinion relies on *Raines v. New York Central*

*R.R. Co.* (1970), 129 Ill. App. 2d 294, 263 N.E.2d 895, *rev'd on other grounds*, (1972), 51 Ill. 2d 428, 283 N.E.2d 230, for the proposition that under Illinois law, evidence of inflation should not be presented to the jury. *Raines* held that evidence of inflation should not be considered because it is too speculative and inflammatory.

The United States Supreme Court, however, has indicated that evidence of inflation is not too speculative and may properly be put before the jury. (*Norfolk & Western Ry. v. Liepelt* (1980), 444 U.S. 490, 494, 62 L. Ed. 2d 689, 694, 100 S. Ct. 755, 757-58.) In *Liepelt*, the court stated that:

> '[F]uture employment itself, future health, future personal expenditures, future interest rates and *future inflation* are also matters of estimate and prediction. Any of these issues might provide the basis for protracted expert testimony. \*\*\* [T]he trial bar and the trial bench has developed effective methods of presenting the essential elements of an expert calculation in a form that is understandable by juries that are increasingly familiar with the complexities of modern life.' (Emphasis added.)

As *Liepelt* recognized, given proper expert evidence the trier of fact could consider future inflation, in the same manner it considers future interest in arriving at a discount rate. The speculative nature of testimony concerning future inflation is no different than the speculative nature of evidence of future interest. There is no logical reason to consider evidence of future interest without also considering evidence of future inflation. (See *Jones & Laughlin Steel Corp. v. Pfeifer* (1983), 462 U.S. 523, 540, 76 L. Ed. 2d 768, 785, 103 S. Ct. 2541, 2552.)" *Thompson*, 158 Ill. App. 3d at 490-91, 511 N.E.2d at 1213 (Buckley, J., dissenting).

Moreover, the Illinois Pattern Jury Instruction (IPI) which defines present cash value is subject to different interpretations as to what method or formula is to be used to determine present cash value. In *Stringham*, the court stated:

> "Illinois Pattern Jury Instructions, Civil, No. 34.05 (2d ed. 1971) (IPI Civil 2d) defines 'present value' as follows:
>
> ' "Present cash value" means the sum of money needed now, which, together with what that sum will earn in the future, will equal the amounts of the pecuniary benefits at the times in the future when they would have been received.'

Defendant notes that the *Thompson* court found that consideration of inflation or growth of earnings is inconsistent with this definition. Both defendant and the court in *Thompson* fail to recognize that two steps are involved in determining a proper award based on loss of future earnings, and that IPI Civil 2d No. 34.05 only pertains to the second step in the process. Before the amount of future earnings can be discounted to present value, it must be determined what that amount is. We agree that once the amount of future earnings to be discounted is known, the inflation rate plays no role in the discount process. However, inflation is relevant to the initial step of determining the total amount of future earnings. In the instant case, plaintiff's economist subtracted inflation from the interest rate during the discount stage. However, as previously noted, this method is mathematically equivalent to inflating earnings and discounting by an unadjusted market interest rate. Thus, we do not find the result of this method inconsistent with the definition of present value in IPI Civil 2d, No. 34.05." *Stringham*, 181 Ill. App. 3d at 320-21, 536 N.E.2d at 1297.

Under the circumstances, we believe that it would be of little benefit for us to discuss and give, or suggest, a further judicial sanction to any one of the possible methods or formulas for determining present cash value in the litigation arena. Rather, we believe that the method or formula to determine present cash value in the litigation arena is best left to the experts in the field rather than the judiciary, so long as the expert's testimony does not clearly transcend the bounds of reason.

If one party disagrees with the other party's expert as to the method or formula for determining present cash value with respect to the facts of the particular case, that party has the recourse of utilizing the crucible of cross-examination or having its own expert witness testify. As on other issues in which experts are permitted to testify, the weight and reliability of the expert witness' testimony is a matter that is within the legitimate realm of the trier of fact to decide. Of course, if there is no expert testimony or other evidence of inflation presented, it would be proper to sustain an objection to argument of counsel urging jurors to consider inflation. (*Prendergast v. Cox* (1984), 128 Ill. App. 3d 84, 92, 470 N.E.2d 34, 39.) In addition, our conclusion recognizes that an expert need not testify only in the form of opinions when utilizing a method or formula for determining present cash value with respect to the facts in particular cases. An

expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts. (Fed. R. Evid. 702, Advisory Committee's Note.) This general rule as to the testimony of experts surely applies to an expert's testimony relating to present cash value.

We therefore conclude that the trial court erred in precluding Linke from testifying as to present cash value by utilizing a formula which incorporates inflation and real wage growth. We also believe that the trial court erred in ruling that Linke was limited to the use of neutral numbers, and in ruling that he could not use "actual or specific numbers tailored to the alleged lost earnings or medical expenses."

With respect to the trial court's ruling relating to limiting Linke to use only neutral numbers, the trial court relied upon *Thompson*. In *Thompson*, the appellate court relied upon *LeMaster* and *Allendorf*. In *LeMaster*, the appellate court relied solely upon *Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill. 2d 164, 133 N.E.2d 288. In *Allendorf*, the court stated:

"We are of the opinion that the proper method of assisting a jury in making damage calculations is for the actuary to use neutral figures. In the usual situation where hypothetical inquiries are permissible, it is necessary that the expert assume a factual situation as reflected in the proof in order to insure that his testimony bears upon the issue to be determined. The actuary, however, is called upon only to describe to the jury a mathematical process that will simplify the jury's task of determining the present value of the contribution that plaintiffs would have received had decedent not been killed. To accomplish that purpose it is not necessary that he use figures that correspond with those appearing in evidence, and when he does so there is a danger that the jury may be misled." 8 Ill. 2d at 177-78, 133 N.E.2d at 295.

We believe it is plain that the supreme court's concern about using neutral rather than actual figures in *Allendorf* relates to the so-called "ultimate issue" rule that was part of the Illinois law at the time. We therefore believe that it is significant that the *Allendorf* opinion predates the supreme court opinions in *Clifford-Jacobs Forging Co. v. Industrial Comm'n* (1960), 19 Ill. 2d 236, 166 N.E.2d 582, *Miller v. Pillsbury Co.* (1965), 33 Ill. 2d 514, 211 N.E.2d 733, and *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809. In these latter three cases, the supreme court effectively abolished the ultimate issue rule. The repudi-

ated ultimate issue rule made an expert's opinion objectionable if it embraced an ultimate issue to be decided by the trier of fact. (Fed. R. Evid. 704, Advisory Committee's Note.) In *Merchants National Bank*, the court stated:

> "Relying upon *Hughes v. Wabash R.R. Co.*, 342 Ill. App. 159, defendant argues that the expert, in stating his opinion, testified to the ultimate issue in the case, thus invading the province of the jury. Opinions of this court however (*Clifford-Jacobs Forging Co. v. Industrial Com.*, 19 Ill. 2d 236; *Miller v. The Pillsbury Co.*, 33 Ill. 2d 514), make it clear that since the trier of fact is not required to accept the opinion of the expert, such evidence does not usurp the province of the jury." 49 Ill. 2d at 122.

In our view, the supreme court's holding in *Merchants* nullifies the requirement in *Allendorf* that an actuary use neutral figures only in making damage calculations. As the supreme court said in *Merchants*, "since the trier of fact is not required to accept the opinion of the expert, such evidence does not usurp the province of the jury." (49 Ill. 2d at 122.) Plainly, there is no more danger that a jury will be misled by an expert using actual rather than neutral figures than there would be with an expert testifying as he did in *Merchants* that a railroad crossing "is very inadequately protected." (49 Ill. 2d at 120.) Moreover, it is equally plain that the use of actual figures by an expert is more informative to the jury than neutral figures would be. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §702.7, at 466 (4th ed. 1984).

We therefore conclude that the trial court erred in ruling that Linke could not testify as to the present cash value of plaintiff's future lost earnings and future medical expenses and care because the report upon which his testimony was to be based did not use neutral figures. Mitchell contends, however, that even if the trial court erred in precluding Linke from testifying in accordance with his report, the plaintiff was not prejudiced. We disagree.

We shall first consider the effect that Linke's testimony could have had if he had been permitted to testify utilizing his formula for determining the present cash value of plaintiff's future medical expenses and care. The amount of plaintiff's pretrial medical expenses and care was $215,233.77. The jury awarded plaintiff $1,450,000 for past and future medical expenses and care. Thus, one may reasonably conclude that the jury awarded plaintiff $1,234,766.30 for future medical expenses and care.

According to his report, Linke would have testified that the

present cash value of plaintiff's future medical expenses and care is $4,390,663 for an option I type of care, and $2,855,355 for an option II type of care. Thus, if Linke would have testified and the jury would have believed his testimony, the jury may have reasonably awarded plaintiff anywhere from $1,620,588.70 to $3,155,896.70 more than it did for plaintiff's future medical expenses and care. This, of course, assumes that the jury would have also believed plaintiff's other evidence relating to his future medical expenses and care. Nevertheless, it is clear that the absence of Linke's testimony substantially prejudiced the plaintiff.

We shall next consider the effect that Linke's testimony could have had if he had been permitted to testify utilizing a formula for determining the present cash value of plaintiff's future lost earnings. The jury awarded plaintiff $440,167 for past and future lost earnings. According to his report, Linke would have testified that the present cash value of plaintiff's future lost earnings is $820,696. Thus, if Linke's testimony would have been permitted and the jury would have believed his testimony, it is evident that the jury may have reasonably awarded plaintiff a substantial amount more than it did for plaintiff's past and future lost earnings. Here again, this assumes that the jury would have also believed plaintiff's other evidence on the subject. However, it is clear that the absence of Linke's testimony substantially prejudiced the plaintiff.

Under the circumstances, we believe that the record sufficiently evinces that the plaintiff was seriously prejudiced by the trial court's ruling which precluded Linke from testifying in accordance with his report, and that the ruling was not within the parameters of the trial court's discretion. We therefore conclude that the plaintiff is entitled to a new trial on damages.

 We next address the directed verdict in favor of Mitchell on the willful and wanton count seeking punitive damages. Punitive damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully or with such gross negligence as to indicate a wanton disregard of the rights of others. (*J.I. Case Co. v. McCartin-McAuliffe* (1987), 118 Ill. 2d 447, 453, 516 N.E.2d 260, 263.) However, the initial question to be answered when punitive damages are sought is whether the facts and circumstances of the particular case justify their imposition. Because of their penal nature, punitive damages are not favored in the law and the courts must take caution to see that punitive damages are not improperly or unwisely awarded. *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195,

211, 454 N.E.2d 210, 219.

When we apply the above principles to the present case, we are convinced that the trial court's ruling on the willful and wanton count seeking punitive damages was proper and should not be disturbed. The evidence demonstrates that Mitchell attempted unsuccessfully to alleviate the excessive oil on the panels prior to the accident in this case and that the problem apparently has now been resolved. Also, prior to the accident, Mitchell had placed warnings on each bundle of panels which notified erectors of the presence of oil on the panels. Under these circumstances, the facts do not justify the imposition of punitive damages. (*J.I. Case Co.*, 118 Ill. 2d at 453; *Hammond*, 97 Ill. 2d at 211.) We therefore conclude that the trial court acted properly in granting Mitchell's motion for a directed verdict on the willful and wanton count seeking punitive damages. See *J.I. Case Co.*, 118 Ill. 2d at 454.

Plaintiff next contends that the trial court erred in giving the jury an instruction on misuse because a jury should not be instructed on misuse. In addition, plaintiff contends that the trial court erred in giving a single instruction combining misuse and assumption of risk. Also, the jury returned a verdict that reads "assumption of risk and/ or commission of misuse," combining the two damage-reducing factors without delineating whether plaintiff was guilty of both assumption of risk and misuse or specifically either assumption of risk or misuse. In view of the fact that we are vacating the judgment that was entered in the trial court and remanding for a new trial on damages only, we need not address the questions presented by these latter contentions and circumstances.

There are other points raised by plaintiff on appeal and by Mitchell on cross-appeal. The trial court awarded plaintiff costs of approximately $6,000 pursuant to section 5—108 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 5—108). However, since the amount that the plaintiff was to receive pursuant to the verdict was less than the setoff available to Mitchell by virtue of the releases that the plaintiff entered into with the former defendants, the trial court applied the costs as part of Mitchell's setoff. By virtue of the trial court's ruling, Mitchell would not have to pay plaintiff the amount of the costs that the trial court had awarded to plaintiff. Plaintiff argues that the trial court "committed error when it set-off settlement amounts against costs." On cross-appeal, Mitchell argues that many of the items for costs should not have been included as costs, and that applying the costs to its setoff was proper. In addition, plaintiff executed a release in favor of his employer, Phalen, in

which Phalen "agreed to waive its statutory workmen's compensation lien accrued up to the date of the settlement." As a result of the release, Phalen was dismissed from the third-party action that Mitchell had brought against Phalen. On cross-appeal, Mitchell argues that under the Contribution Act (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*), Mitchell is entitled to a setoff for the amount of the workmen's compensation lien waived by Phalen in the release and that the trial court erred in denying Mitchell's motion for a setoff for that amount.

It is readily apparent that all of the points which we have discussed in the above paragraph relate to costs and setoffs with respect to the judgment entered in the trial court. Since we are vacating the judgment and remanding for a new trial on damages, we need not decide the issues relating to costs and setoffs at this time. All orders and judgments entered in the trial court relating to costs and setoffs are therefore vacated and set aside without consideration or determination as to the merits or propriety of the trial court's rulings thereon. However, the trial court is advised that all of the consideration specified in the release between plaintiff and Phalen, including the amount of the workmen's compensation lien waiver, should be set off against any subsequent judgment obtained by the plaintiff. *Wilson v. Hoffman Group, Inc.* (1989), 131 Ill. 2d 308, 324, 546 N.E.2d 524, 587.

Accordingly, we vacate the judgment entered in the trial court; enter judgment on the verdict in favor of the plaintiff and against Mitchell as to liability; enter a judgment notwithstanding the verdict in favor of plaintiff on Mitchell's affirmative defenses of assumption of risk and misuse; vacate all setoffs and costs; grant plaintiff a new trial on damages only; and remand for a new trial on damages only.

Judgment vacated; judgment entered and case remanded.

CERDA, P.J., and FREEMAN, J., concur.