MICHAEL CLEVERINGA, Plaintiff-Appellant, v. J.I. CASE COMPANY, Defendant-Appellee.

First District (6th Division) No. 1—91—1993

Opinion filed June 12, 1992.

Matthew K. Szygowski, of Chicago, for appellant.

Johnson & Bell, Ltd., of Chicago (Thomas J. Andrews, Charles P. Rantis, and Thomas H. Fegan, of counsel), for appellee.

JUSTICE LaPORTA delivered the opinion of the court:

Plaintiff, Michael Cleveringa, initiated this product liability action, seeking recovery for personal injuries sustained by him while using a trenching machine manufactured by defendant, J.I. Case Company (Case). Following trial, the jury rendered a verdict for defendant, and the trial court entered judgment in defendant's favor. The trial court denied plaintiff's post-trial motion, and plaintiff has appealed.

On appeal, plaintiff contends (1) the trial court erred in determining that a statement made by defendant in its answer to a third-party complaint was not an admission and should not be presented to the jury; (2) the trial court erred in refusing to apply the doctrine of collateral estoppel to preclude defendant from litigating the dangerous condition of the trenching machine; (3) the trial court erred in prohibiting the introduction of evidence of other accidents involving the defendant's trenching machine; (4) the trial court erred in refusing to allow plaintiff's supervisor to testify that the accident would not have occurred if the defendant's trenching machine had been designed with a safety switch; (5) the trial court improperly allowed the jury to consider whether plaintiff had assumed the risk of his injuries; (6) the trial court improperly instructed the jury as to defendant's duty as manufacturer of the trenching machine; and (7) the jury's verdict was against the manifest weight of the evidence.

The record reveals that plaintiff brought suit seeking recovery for personal injuries sustained during the course of his employment with Telecom Systems, Inc. (Telecom), which installed underground cable

for a cable television company. The complaint alleged that Case, the manufacturer of the trenching machine, and McLaughlin Manufacturing Company (McLaughlin), the manufacturer of the boring rods used on the machine, were liable for his injuries under the theory of strict liability. Case and McLaughlin brought third-party actions against Telecom and filed contribution claims against each other.

Prior to trial, the plaintiff entered into a settlement agreement, releasing McLaughlin and Telecom from all further liability. Although Case had been involved in the settlement negotiations, Case did not participate in the agreement that was ultimately signed. The trial court entered an order, finding the settlement agreement was in good faith and dismissing all pending claims with the exception of plaintiff's claim against defendant Case. Case filed an interlocutory appeal, challenging the trial court's approval of the settlement agreement, and this court affirmed the determination of the trial judge. See *Cleveringa v. J.I. Case Co.* (1989), 192 Ill. App. 3d 1081, 549 N.E.2d 877.

The cause proceeded to trial solely on plaintiff's product liability claim against Case. In his sixth amended complaint, plaintiff asserted that Case designed, manufactured, marketed, and sold the trenching machine, commonly known as the Case "maxi-sneaker," with an attached "hydra-borer" which was purchased by Telecom in March 1982. The complaint alleged further that when Case sold and distributed this trenching machine, it failed to have anchor guides as standard equipment on the machinery and failed to provide a covering for the rotating auger (commonly referred to as the rod). Plaintiff asserted that while using the trenching machine on July 21, 1983, in his employment for Telecom, his apparel came in contact with a portion of the unguarded rotating auger, and his leg was pulled into the auger, resulting in personal injuries to him.

The complaint alleged that the trenching machine was unreasonably dangerous in that Case failed to (a) place adequate warnings or instructions for safe operation of the machine; (b) place safety devices on the machine for the protection of persons who would use the machine; (c) equip the machine with guards adequate to prevent persons from being injured by the rotating borer; (d) provide adequate devices to stop the rotation of the borer; (e) provide adequate warnings as to the dangers of the borer and as to the use of the borers with the machine; (f) provide anchor guides as standard equipment with the attached hydra-borer; and (g) provide a covering as standard equipment for the rotating auger that was to be used with the hydra-borer attachment. The complaint also asserted that as an employee of Tele-

com, he was a normal user of the trenching machine and that Case could reasonably have anticipated that he would use that equipment.

Plaintiff alleged further that while using the trenching machine, and as a direct and proximate result of the unreasonably dangerous condition of the machine, his right leg was caused to become caught in the machine and wrapped around the borer. The complaint asserted that as a direct and proximate result of the acts of Case, plaintiff's right leg was severely broken in the area between the right foot and the right knee when it was wrapped around the boring rod two to three times, breaking the bones and doing extreme permanent damage to his right leg.

Defendant Case filed an answer to the sixth amended complaint, denying the substantive allegations against it and raising as affirmative defenses the plaintiff's assumption of the risk associated with using Case's product and that plaintiff failed to use Case's product in the manner for which it was intended. Defendant asserted further that although anchor guides were not standard equipment on its maxi-sneaker, they were offered as optional equipment if the hydra-borer was ordered with the maxi-sneaker.

Prior to trial, plaintiff moved for partial summary judgment, asserting that (1) based upon a prior adjudication against Case, the doctrine of collateral estoppel should preclude relitigation of the dangerous condition of its trenching machine, and (2) the defense of assumption of risk should not be presented to the jury. The trial court denied plaintiff's motion for partial summary judgment, finding that the doctrine of collateral estoppel was not applicable because, in light of other judgments in Case's favor, it would have been unfair to prohibit Case from asserting that its trenching machine was not unreasonably dangerous. The trial court also found that Case would be permitted to argue that plaintiff assumed the risk of his injuries where there was evidence that he was aware that the presence of bolts on the rods increased the dangers associated with the rotating rods and that he had been warned not to place his foot near the bolts.

During trial, plaintiff attempted to introduce, as a binding judicial admission, a statement made by Case in its answer to McLaughlin's third-party complaint. The trial court excluded the statement sought to be introduced by plaintiff, ruling that it was not a judicial or evidentiary admission.

The evidence adduced at trial established that the rod involved in plaintiff's accident was connected to a maxi-sneaker, which was a multipurpose trenching machine manufactured by Case. When equipped with a hydra-borer attachment, the maxi-sneaker was capable of bor-

ing holes in the ground beneath obstructions such as driveways and streets and was used to bore the holes necessary to lay underground cable. The maxi-sneaker did not have any safety controls which stopped the machine if the operator left it, nor did it have, as standard equipment, guides or coverings to be used with the boring rods.

Before the actual boring operation was commenced, a starting trench was dug, and the hydra-borer attachment and steel rods were then connected to the maxi-sneaker and a drill bit was placed in front of the rods. The hydra-borer attachment provided the force necessary to propel the drill bit into the earth, and the engine of the maxi-sneaker generated the power needed for the rods to bore through the earth.

Case also manufactured guide anchors which could be used with the hydra-borer attachment to control the direction and angle of a bore. Guide anchors were offered by Case as optional equipment and made it unnecessary for users to control the direction of a bore with their hands or legs. Another device sometimes used in boring operations was a T-bar. The T-bar was approximately four feet long with a T-shaped handle at the top and prongs at the bottom which were designed to wrap around a boring rod. The T-bar prevented users from coming into direct contact with the rotating rods.

The 10-foot rods used by plaintiff and his supervisor on the date of the accident were manufactured by McLaughlin, but had been modified at the request of Telecom, plaintiff's employer. In accordance with Telecom's specifications, the coupling mechanisms, which were part of the rods' design, were drilled out, enabling the users to bolt the rods together. The bolts used to connect the rods protruded from the surface of the rods. The rods were bolted together because they had a tendency to come apart underground during the boring operation if their regular coupling mechanisms were relied upon.

Immediately prior to sustaining injury, plaintiff attempted to control the direction and angle of the bore by bearing weight on the rotating rod with his right foot. When his right foot slipped off of the rod, plaintiff was unable to extricate his leg from the narrow trench in which the rod had been placed. While his foot was caught in the trench, the lace of plaintiff's right boot became entangled with one of the bolts protruding from one of the rods. As a result, plaintiff suffered severe injuries to his right foot and leg. Plaintiff underwent 22 operations and numerous hospital stays from the date of the accident through 1988. The parties stipulated to the amount of the reasonable and necessary previous medical expenses.

Plaintiff testified that he first became familiar with the process of laying underground cable and of boring operations in 1982 when he worked for approximately three weeks for a company named Tech Cable. While at Tech Cable, plaintiff worked with Ron Rees, who later became his supervisor at Telecom and was present on the date of the accident.

In the course of his employment with Tech Cable, plaintiff was taught to stand on the rotating boring rod in order to ensure that it was level as it bored the hole for the underground cable. Plaintiff also worked for Tech Cable for approximately four weeks in March 1983. During this time, plaintiff observed other employees stand on the rotating boring rods in order to level them while performing the boring procedure. Plaintiff stated that this same procedure was used by employees of Telecom.

On July 18, 1983, plaintiff began working for Telecom, installing underground television cable. On that date, plaintiff worked with Rees, who was the leader and only other member of the two-person crew. Rees, who instructed plaintiff in the use of the maxi-sneaker, started the boring operation by using the trencher attachment on the maxi-sneaker and dug a trench which angled upward as he backed the trencher away. While Rees dug the trench, plaintiff attached the bolts which connected the boring rods to each other. The rods were then bolted to the hydra-borer attachment. A wooden block in the shape of a brick was laid in the trench, and the front of the rod was placed on the block. When the block was used as a fulcrum, a worker could level the rod by standing on it and ensure that the rod did not enter the ground at an angle.

Rees went to the front of the trench, and plaintiff went to the maxi-sneaker. Upon Rees' signal, plaintiff started the rotation of the rods and the forward movement of the maxi-sneaker. Upon another signal from Rees, plaintiff got off of the maxi-sneaker and stood on the rotating rod in order to keep it level. After the rod had bored a hole of approximately three feet, plaintiff got off of the rod and went across the street to dig a receiving pit through which the rod would emerge.

On July 18, 1983, and on July 21, 1983, the date of the accident, plaintiff wore jeans, a T-shirt, work boots, gloves, and a hard hat. His jeans were either straight-legged or slightly flared. The boots were work boots with a hiking sole. The laces were the same ones that were in the boots when plaintiff purchased them. The boot laces were tied up the front, wrapped once around the ankle, through a loop in

the back, and then brought up front and tied in a bow with two small bows or loops, approximately one inch long, on the end.

Plaintiff testified that there was no work on July 19, 1983, because it rained. On July 20, 1983, plaintiff and Rees completed two successful bores. On July 21, 1983, the date of the accident, plaintiff and Rees went to a boring site in Glenwood, Illinois. Plaintiff testified that at that time, he did not have any knowledge of any devices that could or should have been used during boring operations, and there were no such devices on the truck.

According to plaintiff's testimony at trial, he and Rees used the procedures described above to complete a 60-foot bore on the morning of July 21, 1983. After lunch, they commenced a bore beneath a driveway. Rees dug the starting trench, and plaintiff bolted approximately five or six rods together because there was a tree in the path of the intended bore. After the rods and drill bit had been placed in the trench, plaintiff started the maxi-sneaker. He set the controls to "forward" and "slow speed." At Rees' signal, plaintiff went to the trench in order to apply pressure to the rods with his right foot. Plaintiff's left foot was outside of the trench, which was five or six inches wide. Rees was about three or four feet in front of plaintiff and was also applying pressure to the rod.

Plaintiff testified that he applied pressure to the rod as it bored into the ground approximately two feet. While he was bearing weight on the rod with his right foot, his foot slipped into the trench. The rod was on the inside of plaintiff's ankle, and the side of the trench was on the outside of his ankle. Plaintiff attempted to pull his foot out of the trench for about six or seven seconds, but was unable to get it past the rod. Plaintiff then yelled to Rees, who used a spade in an attempt to pry the rod away from plaintiff's leg. Rees worked with the spade for 10 to 12 seconds. When plaintiff observed that a protruding bolt was moving toward his ankle, he yelled to Rees to shut the machine off. A few seconds later, the bolt came up to plaintiff's boot and caught his shoelace. The shoelace wrapped around the rod a couple of times, and plaintiff's foot was ripped off of his leg. The rod then rolled two or three times up the side of plaintiff's leg, peeling the skin and muscle off of the bone.

On cross-examination, plaintiff testified that Rees had warned him that the protruding bolts increased the danger of the rotating rods. Plaintiff stated further that he had been warned not to place his foot near the bolts and that he was aware of the danger of wearing loose clothing in the vicinity of the rods.

On redirect examination, plaintiff testified that the boot laces he wore on the date of the accident were not excessively long and that he had been warned that contact with the rod could result in damage to his work boot.

The evidence deposition of Ron Rees was read into the record in the presence of the jury. Rees testified that he had been involved in hundreds of boring operations, and in his view, it was always necessary for someone to bear weight on the rods in order to level them. Rees stated that he did not recall having been instructed not to stand on a rotating rod. He also testified that he usually worked at or near the operator's seat, but if a second person was needed to level on the rods, he would leave the operator's seat and stand on the rods. Rees stated further that it was safer to have an operator on the machine while it was running and that there were warning stickers all over the tractors.

Rees testified that he was familiar with T-bars, but they did not work. He stated that he had previously worked with machines that had spring-loaded devices which automatically turned the machine off if the operator left the controls while it was running. Rees testified that the maxi-sneaker functioned as he had intended on the date of plaintiff's accident. Rees also testified that plaintiff's boot laces were "excessively long" on the date of the accident. He stated that it was unusual for a worker to wear excessively long laces on his shoes and that it was not advisable to wear loose clothing around the moving parts of the machine because the clothing could get caught in the machine.

Robert Christensen, an employee of Case, was called by plaintiff as an adverse witness. Christensen testified that, as Case's product claim manager, he received notice of accidents occurring in the United States and Canada involving Case's machines which were equipped with hydra-borer attachments. Christensen produced at trial the logbook which included a record of all of the reported accidents involving injuries resulting from contact with rotating boring rods used with Case machinery.

Christensen testified further that the warranty form, which was completed when the trenching machine used by plaintiff was purchased, appeared to indicate that the operator's manual for a mini-sneaker trenching machine was shipped with the maxi-sneaker in use on the day plaintiff was injured. This conclusion was based on the fact that the serial number on the warranty form matched the serial number printed on the mini-sneaker manual.

Plaintiff called two expert witnesses, Carl Shipley Larson and Lorna Mittendorf, who testified as to their opinions that the maxi-sneaker was unreasonably dangerous. The videotaped testimony of a third expert, Edward McLean, was also presented at trial.

Carl Shipley Larson, Ph.D., testified that the use of a T-bar or of guide anchors kept operators away from the rotating rods. Larson stated on cross-examination, however, that the warnings affixed to the maxi-sneaker and contained in the operators' manuals were adequate. In fact, Larson stated, the warnings were good.

Edward McLean testified on cross-examination that the use of a T-bar could have prevented plaintiff's accident, but it was not practical to cover the entire length of the rod.

Defendant Case called Joseph Lesher, a longtime employee of Case and of Davis Manufacturing Company, the company acquired by Case and which developed the maxi-sneaker. Although Lesher was no longer an employee of Case at the time of trial, he occasionally worked for the company as a consultant. Lesher described the history and the uses of the maxi-sneaker. He stated further that the mini-sneaker was the first direct burial plow machine developed by Davis Manufacturing Company and that the maxi-sneaker was developed later in response to customer requests for a machine which was similar to the mini-sneaker but had greater horsepower. Lesher also testified that guide anchors were not always necessary and were not needed for short bores like the operation in which plaintiff was engaged when he was injured.

Ralph Lipsey Barnett, a professor of mechanical and aerospace engineering at the Illinois Institute of Technology, testified that a maxi-sneaker equipped with a hydra-borer attachment was not unreasonably dangerous. Barnett stated that the warnings affixed to the machine and provided in the operators' manuals were very good. In Barnett's opinion, the warnings appropriately identified the hazard and indicated how to control the danger. Barnett also testified that the maxi-sneaker was not defectively designed. He stated that there was no functional way to cover a rotating rod, which would not, in itself, create new hazards and exposure to dangerous conditions.

Barnett stated further that the lack of a seat switch, which would turn the machine off if the operator left it, did not render the machine defective. Barnett indicated that the inclusion of a seat switch would reduce the desirable features of the machine. He stated that one of the desirable features of the machine, the detent, which allowed the machine to move forward without the need for an operator to manually control the lever, was extremely useful because of the dif-

ficulties inherent in having an operator keep the machine at one steady speed. Barnett also testified that the descriptions of the operation of the hydra-borer attachment, included in the operators' manuals for the maxi-sneaker and for the mini-sneaker, were virtually identical.

Barnett concluded that the accident was not caused by the trenching machine, but resulted from Telecom's alteration of the boring rods by drilling out the coupling mechanisms and replacing them with protruding bolts. Barnett stated that this alteration of the rods introduced a hazard which was not present in the machine as it was sold by the manufacturer. Barnett also indicated that this alteration introduced a methodology that guaranteed that employees would come into direct contact with exposed rods.

In reaching his conclusion that the maxi-sneaker with a hydra-borer attachment was reasonably safe, Barnett relied upon the low frequency rate of accidents, which, according to Case's records, amounted to 12 accidents in slightly over 15 million hours of use.

The exhibits admitted into evidence included photographs of the maxi-sneaker which indicated that the machine bore a warning sticker cautioning users to operate the machine from the operator's seat only.

Also introduced were Case's operators' manuals, which included instructions on how to perform a boring operation, and warned that users should stay clear of the rotating rods; should not use the trenching machine without a person in the operator's seat; should not wear loose clothing because it can become entangled in rotating parts; should keep all personnel out of the trench and target hole; should always make sure that the work area is clear of any people or obstructions before operating the machine; and should never leave the machine running while unattended.

At the close of the evidence and after hearing closing arguments and receiving its instructions, the jury retired. After deliberating for approximately 80 minutes, the jury returned a verdict in favor of defendant and against plaintiff.

Plaintiff filed a post-trial motion, asserting that it was error for the trial court to refuse to admit certain evidence, to deny his motion for partial summary judgment, and to grant certain of defendant's motions *in limine*. Plaintiff also contended that he was prejudiced by the court's refusal to issue certain jury instructions proposed by him, that the jury's verdict was against the manifest weight of the evidence, and that he was denied a fair trial because the jurors were not fair and impartial.

The trial court denied plaintiff's post-trial motion, and plaintiff has appealed.

We initially address plaintiff's contention that the trial court erred in refusing to allow him to present to the jury a statement made in Case's answer to McLaughlin's third-party complaint for contribution. Specifically, plaintiff sought to introduce the statement by Case that "the modifications [of the rods] commonly made in the industry were to drill out the fasteners which were inadequate and to bolt the rods together."

Plaintiff contends that this statement constituted a judicial admission that Case knew or should have known the rods of other manufacturers would be modified for use with its product and that these modifications made the trenching machine and rods unreasonably dangerous. Plaintiff asserts that the failure to allow introduction of this statement left the inference that the modification made to the rod used by plaintiff was a subsequent unforeseeable alteration that relieved Case of any liability. Plaintiff claims further that, based upon this statement in its answer to the third-party complaint, Case was liable to plaintiff as a matter of law.

A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge (*Hansen v. Ruby Construction Co.* (1987), 155 Ill. App. 3d 475, 480, 508 N.E.2d 301; *Baker-Wendell, Inc. v. Edward M. Cohon & Associates, Ltd.* (1981), 100 Ill. App. 3d 924, 929, 427 N.E.2d 317), and an unequivocal admission made in a pleading may be conclusive against the party making such admission. *Baker-Wendell, Inc.*, 100 Ill. App. 3d at 929.

The statement sought to be introduced by plaintiff was included in Case's answer to McLaughlin's claim for contribution and was a part of Case's second affirmative defense, which asserted that McLaughlin was responsible, in whole or in part, for plaintiff's injuries because the rods manufactured and placed in the stream of commerce by McLaughlin were defective and unreasonably dangerous in that (a) they were so designed that they came apart unintentionally and had to be modified by the intended users; (b) the modifications commonly made in the industry were to drill out the fasteners which were inadequate and to bolt the rods together; and (c) McLaughlin failed to properly and adequately warn reasonably foreseeable users of the dangers of substituting nuts and/or bolts for the spring-loaded coupling device used with the boring rods. Case also asserted that the condition of the rods placed in the stream of commerce by McLaughlin should be compared to the condition of the trenching machine when it left the con-

trol of Case for the purpose of determining what, if any, percentage of fault should be allocated to the condition of the trenching machine, in comparison to the condition of the rods.

Case has argued, and the trial court found, that the statement made in paragraph (b) of its second affirmative defense to McLaughlin's third-party complaint was made in 1988, five years after plaintiff's original complaint was filed and well after extensive discovery had been conducted. Consequently, the court determined that this statement was a reflection of the knowledge of Case at the time the pleading was filed, but not an indication of Case's awareness at the time of plaintiff's accident. Plaintiff has not offered any references to evidence in the record which indicate that the challenged statement established Case's knowledge or state of awareness on the date of plaintiff's injury. Based upon this record, the statement sought to be introduced by plaintiff could not reasonably have been a judicial admission of Case's knowledge at the time plaintiff was injured or at the time the trenching machine was placed into the stream of commerce. Consequently, we find that the trial court correctly determined that the statement did not constitute a judicial admission of Case's knowledge and should not have been presented to the jury.

In addition, we note that allegations made in an unverified pleading in a third-party action may not be used as admissions where the allegations were pleaded in the alternative or the claims asserted were contingent. (*Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 842, 462 N.E.2d 645.) Thus, where a third-party complaint seeks relief which is contingent upon the outcome of the plaintiff's action against the defendant, the party making the contingent claims in a third-party action should not be placed in the position of having its claims used as admissions. *Tuttle*, 122 Ill. App. 3d at 842.

In the instant case, McLaughlin filed a third-party complaint against Case seeking contribution for any liability imposed for plaintiff's injuries. This claim was clearly contingent upon the outcome of the original action between plaintiff and McLaughlin. In its answer to McLaughlin's claim for contribution, Case asserted as an affirmative defense that McLaughlin was responsible for the plaintiff's injuries based upon the defective, unreasonably dangerous condition of the rods and alleged that the condition of McLaughlin's rods had to be compared to the condition of Case's trenching machine to determine the percentage of fault to be allocated to the condition of the trenching machine, when compared to the condition of the rods.

Applying the reasoning employed by the court in *Tuttle* to the case at bar, we believe that the second affirmative defense raised by Case against McLaughlin was also contingent upon the outcome of the original action between plaintiff and McLaughlin. Thus, the assertions contained therein could not be construed as judicial admissions which were binding upon Case. *Tuttle*, 122 Ill. App. 3d at 842.

A manufacturer will not be held liable for injury due to unforeseeable alterations to its product. (*Woods v. Graham Engineering Corp.* (1989), 183 Ill. App. 3d 337, 341, 539 N.E.2d 316; *Foster v. Devilbiss Co.* (1988), 174 Ill. App. 3d 359, 363, 529 N.E.2d 581; *Augenstine v. Dico Co.* (1985), 135 Ill. App. 3d 273, 276, 481 N.E.2d 1225.) Plaintiff has asserted that Case knew or should have known what modifications were commonly made in the industry at the time of plaintiff's accident and should have acted appropriately. In support of this claim, plaintiff correctly asserts that Case, as manufacturer of the trenching machine, was held to the degree of knowledge and skill of an expert. *Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 368, 385 N.E.2d 1690.

This is a valid assertion and one which plaintiff was able to make at trial. Yet, plaintiff sought to avoid the burden of proving Case's knowledge of the modifications commonly made in the industry at the time of plaintiff's accident by relying upon the statement made by Case in its second affirmative defense under the theory that the statement was a judicial admission.

As noted above, however, the statement which plaintiff sought to introduce was included in a pleading which was filed five years after the litigation had commenced and after extensive discovery had been conducted. The statement made no reference to any specific date or even to any general time frame, and there was no indication as to when Case acquired its knowledge or awareness that users had modified McLaughlin's rods by drilling out the fasteners in order to bolt the rods together.

Plaintiff was not precluded from introducing any evidence available, whether it was obtained through discovery or by other means, which would have supported his claim that Case knew or should have known at the time of plaintiff's accident that the rods of other manufacturers were used with its trenching machine and that they were unreasonably dangerous when modified for use with Case's product. Indeed, the record indicates that plaintiff questioned Robert Christensen, an employee of Case, on this subject and also elicited testimony by Ralph Barnett, Case's expert, that Case's trenching machine was not reasonably safe when the McLaughlin rods were drilled out and a bolt was used to connect the rods. The record does not, however, sup-

port the claim that plaintiff was deprived of a fair trial because the trial judge excluded the statement made by Case in its second affirmative defense to the claim for contribution by McLaughlin.

We next consider plaintiff's claim that the trial court erred in refusing to apply the doctrine of collateral estoppel to preclude defendant from litigating the dangerous condition of its trenching machine. Plaintiff asserts that, based upon a verdict rendered in a previous case, the trial court should have found that Case's trenching machine was unreasonably dangerous and should have granted his motion for partial summary judgment on this issue.

On December 31, 1990, plaintiff filed a motion for partial summary judgment on the question of whether Case's trenching machine was unreasonably dangerous. Plaintiff contended that because this issue had already been fully litigated and decided in a prior action brought by another plaintiff (*Dukes v. J.I. Case Co.* (1985), 137 Ill. App. 3d 562, 483 N.E.2d 1345, *aff'd in part sub nom J.I. Case Co. v. Martin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 516 N.E.2d 260), Case was precluded from relitigating it in the suit initiated by plaintiff. The trial court denied plaintiff's motion for partial summary judgment, finding that the doctrine of collateral estoppel was inapplicable in the instant case.

The court noted that the doctrine of collateral estoppel was typically used as a defense to subsequent claims against the same defendant where the issues had been fully litigated and decided in an earlier action. The trial judge, exercising his discretion, determined that the offensive use of the doctrine by the plaintiff in the case at bar was not appropriate because it did not seem fair, in light of other judgments in favor of Case, to prohibit Case from asserting that its trenching machine was not unreasonably dangerous. See *Ralston v. Illinois Power Co.* (1973), 13 Ill. App. 3d 95, 299 N.E.2d 497; *Slawson v. J.I. Case Co.* (W.D. Okla.), No. 87—165—P.

The doctrine of collateral estoppel applies when a party participates in two separate and consecutive cases arising on different causes of action and some controlling fact or question material to the determination of both causes has been decided against that party in the former suit by a court of competent jurisdiction. (*Housing Authority v. Young Men's Christian Association* (1984), 101 Ill. 2d 246, 252, 461 N.E.2d 959.) The determination of a fact or issue in the prior case will, if properly presented, be conclusive of the same question in the subsequent action. (*Housing Authority*, 101 Ill. 2d at 252.) The parties need not be identical in both actions, but the party against whom collateral estoppel is asserted must have had an opportunity to

litigate the issue. (*Todd v. Katz* (1989), 187 Ill. App. 3d 670, 674, 543 N.E.2d 1066.) The doctrine of collateral estoppel will be applied only where it appears that the party against whom the estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding and that application of the doctrine will not result in an injustice to the party against whom it is asserted under the circumstances of the case. (*Mohn v. International Vermiculite Co.* (1986), 147 Ill. App. 3d 717, 721, 498 N.E.2d 375; *Fred Olson Motor Service v. Container Corp.* (1980), 81 Ill. App. 3d 825, 830, 401 N.E.2d 1098.) Collateral estoppel is most frequently asserted by a defendant in an attempt to preclude relitigation of an issue which the plaintiff had unsuccessfully litigated against a different defendant in another action. *Mohn*, 147 Ill. App. 3d at 721; *Fearon v. Mobil Joliet Refining Corp.* (1984), 131 Ill. App. 3d 1, 7, 475 N.E.2d 549.

The doctrine of collateral estoppel has also been used offensively by a plaintiff seeking to preclude a defendant from relitigating an issue previously decided against the defendant in an action brought by a different plaintiff. (See *Marlow v. American Suzuki Motor Corp.* (1990), 222 Ill. App. 3d 722, 736, 584 N.E.2d 345; *Fearon*, 131 Ill. App. 3d at 7.) Whether this device should be allowed is subject to the trial court's discretion (*Parklane Hosiery Co. v. Shore* (1979), 439 U.S. 322, 331, 58 L. Ed. 2d 552, 562, 99 S. Ct. 645, 651-52; *Marlow*, 222 Ill. App. 3d at 736), and it may be unfair where there are other inconsistent judgments in favor of the defendant (*Fearon*, 131 Ill. App. 3d at 7, citing *Parklane Hosiery Co. v. Shore* (1979), 439 U.S. 322, 58 L. Ed. 2d 552, 99 S. Ct. 645). This device should not be used to preclude the relitigation of the issue of defective design relating to mass-produced products when the injuries arise out of distinct underlying incidents. *Marlow*, 222 Ill. App. 3d at 736, citing *Goodson v. McDonough Power Equipment, Inc.* (1983), 2 Ohio St. 3d 193, 443 N.E.2d 978.

■ Plaintiff, relying upon the decision in *Dukes*, sought to use the doctrine of collateral estoppel offensively to preclude Case from litigating the dangerous condition of its trenching machine. Exercising his discretion, the trial judge determined that the offensive use of this doctrine was not appropriate where other judgments had been entered in favor of Case, and he found that it would have been unfair to prohibit Case from arguing that its product was not unreasonably dangerous. Based upon the record before us, we hold that the trial court correctly refused to apply the doctrine of collateral estoppel to prohibit Case from presenting a defense to the plaintiff's product liability claim.

In *Dukes*, the plaintiff was using a product manufactured by Case known as a Fleetline No. 40 + 4 trencher and an attached hydra-borer. The plaintiff stood in the trench and used his bare hands to guide the rotating rod. He was injured while climbing out of the trench when the rotating rod bounced up, caught his pant leg, pulled him down into the ditch, tore off his pants, and tangled up his belt and sweatshirt.

In the case at bar, the plaintiff had his right foot on the rod and he was bearing weight on it in order to ensure that the rod did not enter the ground at an angle. Although he had been instructed not to stand near a bolt, plaintiff's foot became caught in the trench when his foot slipped off of the rod, and his boot lace became entangled on a bolt. There was no evidence that the rod bounced up or became caught on plaintiff's pant leg, and plaintiff was guiding the rod by bearing weight on it while it performed the boring operation, despite the fact that he had been warned not to stand near a bolt.

We find that these cases were factually distinct and presented safety and design issues which were necessarily different. Because the circumstances of the underlying incident in which plaintiff was injured were distinguishable from those encountered by the plaintiff in *Dukes*, the trial court properly refused to apply the doctrine of collateral estoppel in the instant case.

Plaintiff next contends that the trial court erred in prohibiting the introduction of evidence of other accidents involving the defendant's trenching machine. Plaintiff claims that the trial court improperly refused to allow introduction of reports of other accidents involving workers who were injured when they came in contact with rotating boring rods which were being used with Case's trenching machine. Plaintiff sought to establish not only notice to Case of the danger inherent in use of the trenching machine, but also to establish the severity of the injuries caused by Case's product. Plaintiff intended to argue that, based upon the severity of these injuries, Case should have reacted and made its machine more safe for users and operators.

The trial judge limited plaintiff's use of these reports to establish notice to Case of the injuries and to show the frequency of such accidents, but refused plaintiff's request to publish the full content of the reports to the jury. The trial judge's ruling was predicated upon his finding that the reports were hearsay evidence and not adequately substantiated to go to the jury.

Plaintiff has asserted that the trial court's ruling precluded him from informing the jury of the severity of the injuries which occurred with use of Case's trenching machine and prejudiced his ability to con-

vince the jury that Case's product was unreasonably dangerous. Plaintiff has not, however, offered any case citations to support this argument.

Although evidence of prior occurrences may under certain circumstances be admissible to establish notice of a dangerous condition (*Simmons v. Aldi-Brenner Co.* (1988), 162 Ill. App. 3d 238, 245, 515 N.E.2d 403), it is not considered error for a court to exclude evidence which, in the judgment of the trial judge, does not reasonably bear upon the specific issues before the court (*Eleopoulos v. Dzakovich* (1981), 94 Ill. App. 3d 595, 600, 418 N.E.2d 980).

■ In the instant case, plaintiff did not present any competent evidence to substantiate or corroborate the contents of the accident reports. Thus, there was no foundation for the details of the injuries reported or described in these reports. Based upon the evidence presented to the trial judge, the issue of the severity of those injuries was not before the jury, and the trial judge properly determined that they should be admitted only to establish notice to defendant Case and the frequency of accidents involving Case's maxi-sneaker and hydra-borer attachment.

Plaintiff also asserts that the trial court erred in refusing to allow his supervisor, Ron Rees, to testify that the accident would not have occurred if the defendant's trenching machine had been designed with a safety switch. Plaintiff contends that because Rees was a "practical expert as far as borings [were] concerned," the trial court should have permitted him to testify that the plaintiff's accident would not have happened if there had been a safety switch on the trenching machine. Plaintiff claims that the trial court's ruling prejudiced his ability to convince the jury that Case's trenching machine was unreasonably dangerous.

The trial court struck the offered testimony of Rees because the question posed by plaintiff's counsel requested that Rees offer an opinion as to the design of the trenching machine. The court determined that Rees' deposition testimony as to how a spring lever might have avoided this accident constituted impermissible reconstruction evidence. The trial judge also found that Rees' testimony on this issue would have been cumulative of the testimony to be presented by plaintiff's expert witnesses.

The question of whether a witness is competent to give expert testimony is to be determined by the trial court (*Tuttle*, 122 Ill. App. 3d at 840-41), and the trial court has discretion in deciding whether a witness has been qualified as an expert (*Bloomgren v. Fire Insurance Exchange* (1987), 162 Ill. App. 3d 594, 599, 517 N.E.2d 290). The test

of the competency of an expert witness is whether he discloses sufficient knowledge of the subject matter to entitle his opinion to go to the jury. *Bloomgren*, 162 Ill. App. 3d at 599; *Gibson v. Healy Brothers & Co.* (1969), 109 Ill. App. 2d 342, 353, 248 N.E.2d 771.

The burden of establishing the qualifications of an expert witness rests on the party seeking to introduce the testimony, and the standard of review is whether the trial court abused its discretion in declining to permit a witness to testify as an expert. (*Bloomgren*, 162 Ill. App. 3d at 599.) There is no presumption that a witness is competent to give an expert opinion, and it is incumbent upon the party offering the witness to show that he possesses the necessary learning, knowledge, skill, or practical experience to enable him to testify as an expert. (*Broussard v. Huffman Manufacturing Co.* (1982), 108 Ill. App. 3d 356, 362, 438 N.E.2d 1217.) Mere practical knowledge and frequent use of a machine do not qualify the user as an expert on issues of equipment design or manufacture. (*Baltus v. Weaver Division of Kidde & Co.* (1990), 199 Ill. App. 3d 821, 837, 557 N.E.2d 580.) Thus, a witness who has not been qualified as an expert is unable to give his personal opinion as to the safety of a device as designed. *Baltus*, 199 Ill. App. 3d at 837; *Davis v. International Harvester Co.* (1988), 167 Ill. App. 3d 814, 827, 521 N.E.2d 1282; *Broussard*, 108 Ill. App. 3d at 362.

In the case at bar, although Rees had substantial experience in laying underground cable and in using boring machines, including the Case maxi-sneaker and hydra-borer attachment, he had no design or engineering experience. Consequently, Rees did not have the necessary skill or expertise to qualify as an expert in the manufacture or design of the maxi-sneaker. Thus, he was unable to testify, with any degree of scientific certainty, that the accident could have been prevented if a safety switch had been included in the maxi-sneaker's design. We hold that the trial court ruled correctly in striking Rees' testimony that the plaintiff's accident would not have occurred if the defendant's trenching machine had been designed with a safety switch.

Plaintiff next contends that the trial court improperly allowed the jury to consider whether he had assumed the risk of his injuries.

Plaintiff filed a motion for partial summary judgment, alleging that defendant Case should have been precluded from claiming as an affirmative defense that plaintiff had assumed the risk associated with his injuries. The trial court denied plaintiff's motion, finding that Case would be permitted to argue that plaintiff assumed the risk of wearing long shoelaces while bearing weight on the rotating rod with his

right foot and of placing his foot near the bolt on the rotating rod. In making this determination, the trial court found that plaintiff's own testimony indicated that he was aware that the presence of the bolts increased the dangers associated with the rotating rods and that he had been warned not to place his leg near the bolts.

The doctrine of assumption of the risk is an affirmative defense in product liability cases. (*Williams v. Brown Manufacturing Co.* (1980), 45 Ill. 2d 418, 430, 261 N.E.2d 305; *Erickson v. Muskin Corp.* (1989), 180 Ill. App. 3d 117, 122, 535 N.E. 2d 475.) Applicability of this defense is a factual determination to be made by the jury (*Duffy v. Midlothian Country Club* (1980), 92 Ill. App. 3d 193, 200, 415 N.E.2d 1099), and the defendant bears the burden of proving that the plaintiff knew the product was in a dangerous condition and proceeded to use it in disregard of the known danger (*Sweeney v. Max A.R. Matthews & Co.* (1970), 46 Ill. 2d 64, 66, 264 N.E.2d 170; *Erickson*, 180 Ill. App. 3d at 122). In a product liability case, the issue of whether the plaintiff assumed the risk of using the product must refer to the use of that aspect of the product that was alleged and proven to be unreasonably dangerous. *Varilek v. Mitchell Engineering Co.* (1990), 200 Ill. App. 3d 649, 661, 558 N.E.2d 365.

Assertion of this defense in a product liability suit requires proof that the plaintiff voluntarily and unreasonably proceeded to encounter a known danger. (*Varilek*, 200 Ill. App. 3d at 662.) The test is subjective because what must be considered is the state of mind of the particular plaintiff rather than that of a reasonably prudent person. (*Varilek*, 200 Ill. App. 3d at 662.) Yet, that determination is not to be made solely on the basis of the plaintiff's own statements, but rather upon an assessment of all the facts established by the evidence. (*Varilek*, 200 Ill. App. 3d at 662, citing *Williams v. Brown Manufacturing Co.* (1980), 45 Ill. 2d 418, 430, 261 N.E.2d 305, 312; Restatement (Second) of Torts §402(A) (1965).) Plaintiff's age, experience, knowledge, and understanding, in addition to the obviousness of the defect and the danger it poses, will all be relevant factors for the jury's consideration. (*Erickson*, 180 Ill. App. 3d at 125.) If there is some evidence from which a jury might infer plaintiff's assumption of the risk, then it is within the jury's province to determine that issue. *Erickson*, 180 Ill. App. 3d at 124.

■ In the case at bar, the plaintiff testified that he knew that rotating rods were dangerous and that the bolts protruding from the rods increased the danger. He also testified that he had been warned that the exposed rods were dangerous and not to place his foot near the bolts. The evidence established that plaintiff's injuries occurred

because the lace of his right boot became entangled on a bolt after his foot slipped from the rotating rod and became stuck in the narrow trench. Plaintiff testified further that he was aware that loose clothing and long shoelaces were dangerous when working near the equipment. Rees testified that plaintiff's shoelaces were excessively long on the date of the accident.

Considering the plaintiff's age, experience, knowledge, and understanding, as well as the obviousness of the bolts and the danger they posed, we hold that it was reasonable for the trial judge to conclude that the length of plaintiff's shoelaces and the placement of his foot on the rod near a bolt were matters which were entirely within his control and which, if proved, could establish assumption of the risk in the product liability action. Consequently, the trial court correctly permitted the jury to consider the assumption of risk defense asserted by Case.

■ Plaintiff contends that, because he was required to perform his job duties without safety devices, he did not voluntarily expose himself to the danger presented by Case's trenching machine, and the court should not have permitted the jury to consider this defense.

In support of this argument, plaintiff relies primarily on *Varilek v. Mitchell Engineering Co.* (1990), 200 Ill. App. 3d 649, 558 N.E.2d 365, where the court held that a defendant in a product liability action could not raise assumption of the risk as a defense where the evidence indicated that the plaintiff had performed his job duties in accordance with his employer's instructions and the plaintiff had no alternative but to accept the risk posed by his employment in order to exercise and protect his right and privilege to do his job. *Varilek*, 200 Ill. App. 3d at 664.

The *Varilek* case is, however, distinguishable from the instant case because the plaintiff here was aware of the danger presented by the protruding bolts on the rods, and he was in control of where he placed his foot to level the rotating rod while it performed the boring operation. Plaintiff could have followed the directive of Rees and made sure his foot was not near a bolt when he attempted to level the rotating rod. Plaintiff was also in control of the length of his shoelaces and testified that he was aware that excessively long shoelaces could be dangerous. Plaintiff testified that he was specifically instructed not to place his foot near the bolts. Consequently, the *Varilek* decision is not controlling here because the record indicated that plaintiff could have performed his job duties in a manner which would not have put him in danger of sustaining injury caused by the bolts on the rotating rods.

Moreover, as defendant has pointed out, any purported error committed by the trial judge on this issue would be deemed harmless where the jury's verdict reflected that the defendant's product was not unreasonably dangerous. (See *Puckett v. Empire Stove Co.* (1989), 183 Ill. App. 3d 181, 193, 539 N.E.2d 420.) In the instant case, the trial court instructed the jury to consider plaintiff's assumption of risk only if it found for the plaintiff. The jury entered a verdict in favor of defendant Case, finding that Case was not liable for plaintiff's injuries. Consequently, the jury did not reach the issue of plaintiff's assumption of risk, and plaintiff is not entitled to reversal of the verdict on this basis.

Plaintiff next asserts that the trial court failed to correctly instruct the jury as to Case's duty as manufacturer of the trenching machine and improperly caused prejudice to plaintiff regarding the defendants who had entered into a pretrial settlement with plaintiff.

Specifically, plaintiff contends that the court erred in refusing to give plaintiff's proposed instructions numbered 4, 9, 11, 12, 13, 14, 15, 16, and 17.

■ Plaintiff's proposed instruction number 4 relied upon the *Varilek* case and provided, *inter alia*, that plaintiff could not be said to have assumed the risk of his injuries if he was following his employer's instruction. This instruction was properly refused because, contrary to the *Varilek* case, the evidence did not establish that plaintiff had no alternative but to place his foot on the rotating rod near the bolt. Plaintiff's own testimony indicated that his supervisor instructed him *not* to place his foot near the bolts. Consequently, the record indicated that plaintiff could have performed the duties required by his employer in a manner which would not have put him in danger of sustaining the injuries caused by the bolts on the rotating rods. In addition, the record indicates that Case was precluded from arguing as a defense that plaintiff's injuries were caused by his employer's improper directive that he stand on the rotating rod. We hold that the trial court correctly refused to issue plaintiff's proposed instruction number 4.

Plaintiff's proposed instruction number 9 provided that if the jury found for the plaintiff and against the defendant, it was to (a) determine the total amount of damages due plaintiff; (b) itemize those damages for disability, disfigurement, pain and suffering, medical expenses, and lost earnings; (c) determine the percentage of responsibility to be borne by plaintiff for his assumption of risk; and (d) determine the percentage of responsibility attributable to Case and to Telecom, plaintiff's employer.

The fault of nonparties may be considered by a jury in assessing the plaintiff's assumption of risk (*Bofman v. Material Service Corp.* (1984), 125 Ill. App. 3d 1053, 1060, 466 N.E.2d 1064), and the trial court advised the jury of this requirement. The record reveals that the trial judge instructed the jury to "determine what portion or percentage [of fault] is attributable solely to the plaintiff's conduct in assuming the risk considering the extent to which plaintiff's assumption of risk and the conduct of the employer, Telecom, and the unreasonably dangerous condition of the J.I. Case Maxi-Sneaker with the hydra-borer attachment each proximately contributed to the plaintiff's injury."

■ The jury in the instant case did not, however, render its verdict on the basis of plaintiff's assumption of risk. The jury never reached this question because its verdict was predicated upon the finding that Case was not liable to plaintiff. Consequently, the jury was not required to assess the percentage of fault attributable to Telecom or to consider any reduction of damages based upon plaintiff's assumption of risk. Thus, the court's failure to give plaintiff's proposed instruction number 9 cannot be considered reversible error. *Puckett*, 183 Ill. App. 3d at 193.

Plaintiff's proposed instructions numbered 11 and 12 provided that if a party failed to produce a witness or evidence within his power to produce, the jury may infer that the evidence or testimony of the witness would be adverse to that party if (a) the witness or evidence was under the control of the party and could have been produced by the exercise of reasonable diligence; (b) the witness or evidence was not equally available to an adverse party; (c) a reasonably prudent person under the same or similar circumstances would have produced the witness or evidence if he believed the evidence or testimony would be favorable to him; and (d) no reasonable excuse for the failure had been shown.

Plaintiff requested that these instructions be given to the jury, claiming that because Case produced no witnesses or evidence regarding any safety or field tests on the maxi-sneaker with hydra-borer attachment, the jury should be able to infer that such evidence or testimony would be adverse to Case.

These instructions are to be given in the sound discretion of the trial court (*Tuttle*, 122 Ill. App. 3d at 843) where foundation evidence has been presented which indicates that (1) the evidence was under the control of the party and could have been produced upon the exercise of due diligence; (2) the evidence was not equally available to the party seeking the instruction; (3) a reasonably prudent person would

have produced the evidence; and (4) there was no reasonable excuse for the failure to produce the evidence (*Wetherell v. Matson* (1977), 52 Ill. App. 3d 314, 318, 367 N.E.2d 472).

■ These instructions were properly refused in the instant case because the record before the trial court did not contain any indication that Case had conducted any field or safety tests. These instructions are warranted only where the evidence actually exists but is not produced by the only party to whom it is available. Issuance of these instructions is not warranted where, as here, the record is void of any indication that the evidence exists. We find no reversible error where the trial court refused to issue these instructions requested by plaintiff but ruled that they were appropriate subjects for closing argument.

Plaintiff argues that his proposed instruction number 13, which was modified by the trial judge, was contradictory and confusing and should not have been given. Instruction number 13 provided that a manufacturer is under a nondelegable duty to make a product which is not unreasonably dangerous, but a manufacturer is under no duty to make its product as safe as possible. Plaintiff does not object to the first clause of the instruction, but contends that the court erred by including the second clause.

■ We hold that this instruction was properly given because it correctly stated the duty owed by a manufacturer defending against a product liability claim. *Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, 217, 412 N.E.2d 959; *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 211, 384 N.E.2d 368.

■ Plaintiff's proposed instruction number 14 relied upon *Anderson v. Hyster* (1979), 74 Ill. 2d 364, 385 N.E.2d 690, and provided that a manufacturer is held to the degree of knowledge and skill of experts. This instruction was appropriate and could have been given in the trial judge's discretion. Yet, instructional errors will warrant a reversal only where prejudice is shown. (*Erickson*, 180 Ill. App. 3d at 127.) We hold that plaintiff has not established that he was prejudiced by the trial court's refusal to issue his proposed instruction number 14.

Plaintiff's proposed instruction number 15 relied upon *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1967), 86 Ill. App. 2d 315, 229 N.E.2d 684, and provided that a manufacturer is required to take reasonable precautions in light of dangerous propensities of a product which are or should be known. Contrary to the trial court's conclusion, this instruction may be appropriate in a product liability action. (See *Dunham*, 86 Ill. App. 2d at 325-26.) What, if any, precautions are

required is a question that will vary with the circumstances, especially where the dangerous condition or propensity of the product is not fully known and appreciated by those using it. See *Dunham*, 86 Ill. App. 2d at 325-26.

In the case at bar, plaintiff testified that he was aware of the danger posed by the protruding bolts on the rotating rods and had been warned not to place his foot near the bolts. This evidence established that the dangerous condition or propensity of the product was fully known and appreciated by plaintiff. Consequently, we find that plaintiff was not prejudiced by the trial court's refusal to issue his proposed instruction number 15. *Erickson*, 180 Ill. App. 3d at 127.

Plaintiff's proposed instruction number 16 relied upon *Soto v. E.W. Bliss Division of Gulf & Western Manufacturing Co.* (1983), 116 Ill. App. 3d 880, 452 N.E.2d 572, and provided that a product may be unreasonably dangerous if a manufacturer failed to warn or gave an inadequate warning of a condition which it knew or should have known was dangerous. This instruction was properly refused where the trial court followed the recommendation of Illinois Pattern Jury Instructions, Civil, No. 400.07 (3d ed. 1991) (hereinafter IPI Civil 3d), which advises trial judges not to give any instructions on the duty to warn but to leave it to counsel to argue whether the product was unreasonably dangerous because of the lack of or the inadequacy of warnings. According to the comment to this instruction, the failure to adequately warn of a dangerous condition is a proper subject for argument but not for instruction. IPI Civil 3d No. 400.07, Comment.

Plaintiff's proposed instruction number 17 provided that plaintiff did not assume the risk of his actions if he left the operator's seat or stood on the rotating rod pursuant to his employer's directions. This instruction, like number 4 discussed above, would have indicated to the jury that plaintiff could not have assumed the risk of his injuries where he was merely acting on the directives of his employer. The record established, however, that plaintiff could have performed his duties in a manner which would not have put him in danger of sustaining the injuries caused by the bolts on the rotating rods. Consequently, the trial court properly refused to issue plaintiff's proposed instruction number 17.

Finally, we consider plaintiff's claim that the jury's verdict was against the manifest weight of the evidence.

In determining whether a jury verdict should be set aside, a court must decide whether the verdict was against the manifest weight of the evidence (*Junker v. Ziegler* (1986), 113 Ill. 2d 332, 339, 498 N.E.2d 1135; *Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill.

App. 3d 438, 443, 511 N.E.2d 798), and the evidence must be viewed in a light most favorable to the appellee (*Erickson*, 180 Ill. App. 3d at 125). Where there is evidence in favor of the defendant which, if believed, supports the verdict, the reviewing court should not set aside a jury determination. (*Tedrowe*, 158 Ill. App. 3d at 444.) The test is not whether the evidence *could have* supported a verdict for the movant if contrary inferences were drawn, but whether a contrary verdict is clearly evident. *Johnson v. Colley* (1986), 111 Ill. 2d 468, 474, 490 N.E.2d 685; *Tedrowe*, 158 Ill. App. 3d at 444.

In the instant case, there was conflicting evidence as to whether the Case maxi-sneaker with the hydra-borer attachment was unreasonably dangerous.

Plaintiff's expert Carl Larson testified that Case's maxi-sneaker with attached hydra-borer was unreasonably dangerous because guide anchors were not standard equipment despite the fact that they would have prevented plaintiff's accident. Larson also stated that the product was unreasonably dangerous because it did not have a covering for the rotating rod or a seat switch, which would have turned the machine off if the operator left it.

Lesher's testimony indicated that Case was advised as early as 1967 that workers had been standing on the rods and that injuries resulted when the rotating rod caught onto their clothing. Lesher also testified that tests regarding safety switches should have been considered after plaintiff's accident.

Lorna Mittendorf testified that Case's product was unreasonably dangerous because the instructions were confusing, were inadequate to properly warn a user of the danger posed by boring operations, and did not adequately instruct a user as to the correct procedure for performing a boring operation.

Plaintiff's expert Edward McLean testified that the McLaughlin "Mighty Mole" boring machine was sold with guiding devices as standard equipment, and Rees testified that he had previously worked with machines which had a seat switch which would have shut off the engine if the operator left it.

The operators' manuals for Case's trenching machines were admitted into evidence as was the owner's warranty card which indicated that the manual for a mini-sneaker was shipped along with the maxi-sneaker purchased by Telecom and involved in plaintiff's accident. The manual for the mini-sneaker included instructions on how to perform a boring operation, and warned that users should stay clear of the rotating rods; should not use the trenching machine without a person in the operator's seat; should not wear loose clothing because

it can become entangled in rotating parts; should keep all personnel out of the trench and target hole; should always make sure that the work area is clear of any people or obstructions before operating the machine; and should never leave the machine running while unattended. Plaintiff pointed out, however, that there was no evidence that an operator's manual was with the machine at the time plaintiff was injured.

Also introduced into evidence were photographs of the maxi-sneaker which indicated that the machine bore several warning stickers, including one cautioning users to operate the machine from the operator's seat only.

Defendant's expert Ralph Barnett testified that the warnings on the machine and in the manuals were adequate to warn users to stay clear of the rotating rods and not to wear loose clothing when operating the machine. Barnett stated further that a rod covering would create new dangers for users and that a safety switch would not be a desirable feature based upon the function of the machine. Barnett indicated that the low accident frequency rate supported the conclusion that the machine used by plaintiff was not unreasonably dangerous. Barnett also stated that the bolting of the rods, rather than reliance on the coupling mechanisms with which they were designed, made the rods 1,000 times more dangerous.

Joseph Lesher, an employee of Case, testified that guide anchors were not always necessary and were not needed for short bores like the operation in which plaintiff was engaged when he was injured.

In addition, plaintiff's expert witness Carl Larson testified that the warnings on the machine and in the operators' manuals were "good."

Plaintiff testified that Rees had warned him that the protruding bolts increased the danger of the rotating rods and that he was warned not to place his foot near the bolts.

This evidence established that plaintiff was informed of and aware of the danger posed by the bolts. It was also established that the protruding bolts and the danger they posed were obvious.

Upon consideration of the conflicting evidence, in addition to all of the other evidence presented at trial, the jury determined that Case's product was not unreasonably dangerous and found that Case was not liable for plaintiff's injuries.

The jury heard the witnesses testify, observed their demeanor, and determined their credibility. The record included evidence in favor of the defendant which, if found credible by the jury, supported the verdict. A contrary verdict was not clearly evident from the evidence

presented. Considering the evidence in the light most favorable to defendant Case (*Erickson*, 180 Ill. App. 3d at 125), we hold that the jury's verdict was not against the manifest weight of the evidence.

Plaintiff has asserted that the jury was not fair and impartial and could not have considered all of the evidence because it rendered a verdict within 80 minutes.

In support of these claims, plaintiff refers to the fact that during the trial one of the jurors advised the court's deputy that he wanted to talk to the trial judge and that he did not think he could be a good juror. Although this juror was questioned by the trial judge and was informed that he would be released if he could not remain neutral, the juror indicated that he would be fair and impartial. Both parties agreed that he should remain as a juror.

Plaintiff also points out that prior to final arguments and before the jury was instructed on the law, the alternate juror was released. Upon being released from service, the alternate juror stated that he did not wish to speak with representatives of either counsel because he had already formed an opinion about the case but did not want to disclose it.

Lastly, plaintiff argues that the jury must have ignored the law and evidence presented because it retired, picked a foreman, ate lunch, and reached a verdict within 80 minutes.

█ We find that the record does not support plaintiff's claim that the jury was biased. We note that the first juror discussed his obligation with the trial judge in the presence of counsel and, knowing that he would be released if he could not remain neutral, he agreed that he would be fair and impartial. Counsel for both parties acquiesced in the decision not to release him. There is no evidence in the record that this or any other member of the jury was biased for or against either party. Moreover, we will not find reversible error where counsel for plaintiff raised no objection and where all parties agreed that the juror should remain seated.

We also hold that plaintiff has not established that the jury was biased merely because an alternate juror stated that he had formed an opinion about the case. In reaching this conclusion, we note that this juror indicated that he had formed an opinion after all of the evidence had been presented and after he had been released from service. When he made this statement, the alternate juror could no longer affect the outcome of the cause in any way, and plaintiff is not entitled to a new trial on this basis.

In denying plaintiff's post-trial motion, the trial judge specifically found that the jury was not biased and that its deliberations were not

unreasonably short. The trial court also noted that there was no indication that the members of the jury had discussed or deliberated on the case before it was instructed on the applicable law. In light of the warnings in the operator's manual and placed directly on the trenching machine, the obviousness of the danger, and the age, experience, and knowledge of the plaintiff, we do not find it unreasonable that the jury rendered its verdict in favor of Case within 80 minutes. Consequently, we find that plaintiff is not entitled to a new trial on this basis.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNAMARA and RAKOWSKI, JJ., concur.