Martin WALSH, Plaintiff–Appellant,

v.

EMERGENCY ONE, INC.,
Defendant–Appellee.

No. 93–1149.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1993.

Decided June 21, 1994.

Michael D. Monico, Barry A. Spevack (argued), Robert J. Pavich, Monico, Pavich & Spevack, Chicago, IL, for plaintiff-appellant.

John M. Coleman (argued), Justin J. Power, Johnathan P. Wynn, Coleman & O'Halloran, Chicago, IL, for defendant-appellee.

Before WOOD, CUDAHY, and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Martin Walsh was a veteran Chicago fire fighter who was injured when he was thrown from the unenclosed seating atop a fire truck as the truck responded to an emergency call. The truck was designed by Emergency One, Inc. (EO). The seating was equipped with seat belts which the parties agree the fire fighter did not use. Based on his injury, Walsh filed a complaint against EO alleging product liability (Count I) and negligence (Count II). EO responded to Count I by pleading assumption of risk and responded to Count II by pleading contributory negligence. Walsh appeals a jury verdict for EO. We affirm.

## I.

The Chicago Fire Department (the Department) purchased the truck in question (Engine 61) from EO in 1979. EO was the low bidder in response to the Department's contract specifications. The design of Engine 61 satisfied all existing National Fire Protection Association (NFPA) safety standards. The design included unenclosed seating which was located behind the cab of the truck, allowing the fire fighters to sit three abreast on a bench seat facing the rear of the truck. The seating area had a canopy over the top that extended down and connected to the sides of the bench. The seating area was also equipped with seat belts. However, the area in question was completely open on the side where the fire fighters get on and off. As of 1985, the Department had in place a requirement that fire fighters be fully dressed, seated and belted before the truck moved. Nevertheless, it was very uncommon for Chicago fire fighters to use their seat belts.

Walsh joined the Department in 1966. From that time he worked on fire trucks identical to Engine 61 and was familiar with the open seating area. Walsh never wore a seat belt while on the job. On September 4, 1989, Walsh was assigned to Engine 61 when it responded to an alarm. As the truck headed out of the fire house, it swerved to avoid construction in the roadway, causing Walsh to fall out of the open seating area and off the truck. One of the firemen sitting beside Walsh testified that he thought he saw Walsh, a large man encumbered by heavy equipment, lean forward before he fell, then turn or stand while reaching for his helmet. Walsh was not, of course, wearing his seat belt at the time.

Walsh sustained serious and permanent injuries. He sued EO, alleging that the area behind the cab was defectively designed because it was not enclosed. He contended that he would not have fallen from the truck had the bench seating area been equipped with some sort of enclosure. Walsh concedes, however, that he would not have been injured had he used his seat belt.

After conceding at trial that the chance of falling from a fire truck while wearing a seat belt was minimal, Walsh's expert nonetheless testified that Engine 61 was unreasonably dangerous because the bench seating was not enclosed. The expert testified that, at the time Engine 61 was manufactured, manufacturers knew that an unenclosed seating area presented dangers because fire fighters did not wear seat belts that were provided (apparently because they needed to adjust their bulky equipment as they rode to a fire). In the expert's opinion, fire truck manufacturers could not reasonably rely on fire department rules requiring the use of seat belts to protect fire fighters in exposed seating areas. Instead, the expert suggested that Dutch doors would help protect fire fighters by preventing their falling from the truck. Additionally, such doors could protect tools and equipment stored on the floor of the seating area.

EO's expert testified that the unenclosed canopy-type design employed in Engine 61 was popular when the truck was purchased, and contended that Engine 61 was not unreasonably dangerous. He maintained that, because the cab, floor and canopy formed a five-sided enclosure, fire fighters in the unenclosed area would be safe if they used their

seat belts or if they simply remained seated. This expert opined that Dutch doors would protect seated fire fighters but would not contain fire fighters who stood up. The expert also testified that truck manufacturers could reasonably believe that, if truck specifications called for seat belts or if fire department directives required their use, belts would in fact be used.

Another witness for EO, who is familiar with national fire fighting safety standards and statistics, testified that the largest share of fire fighter casualties occurring away from the fire scene involves accidents on a rescue apparatus such as a fire truck. He said that the National Transportation and Safety Board recommends the use of belts whenever an apparatus is in motion. And he had conducted a survey suggesting that the vast majority of fire departments enforced seat belt requirements. He further testified that the Chicago Fire Department had become concerned about the use of seat belts as early as 1955, after three fire fighters died in accidents that seat belts might have prevented. EO's witness also felt that Walsh would not have fallen had he been wearing a seat belt and that Dutch doors would not completely protect fire fighters from falls from open seating areas.

In this appeal, Walsh argues that failure to wear a seat belt is not evidence of assumption of risk or of contributory negligence. Nor is reliance on the Department's manufacturing specifications a defense. Walsh also contends that EO should not have presented evidence that the fire house record of his accident had been destroyed. In addition, Walsh claims he was erroneously barred from showing post-manufacture industry standards, which require enclosed seating. He also urges error in the omission of part of a pattern instruction which stated that the

jury could find more than one proximate cause of his injury.

EO contends, on the other hand, that the trial court did not err in allowing it to argue assumption of risk and contributory negligence, that it never argued that it relied on the Department's design specifications and that it never introduced evidence that the fire house record of the accident had been destroyed. EO also argues that the trial court did not err in excluding post-manufacture standards or in instructing the jury on the issue of proximate cause.

## II.

### A. *Standards of Review*

 We review the trial court's decision to admit or exclude evidence for abuse of discretion. *Geitz v. Lindsey*, 893 F.2d 148, 150 (7th Cir.1990); *see also Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1268–69 (7th Cir.1991). In addition, inadequate jury instructions are cause for reversal only if it appears that the jury's comprehension of the issues was so misguided that one of the parties was prejudiced. *Littlefield v. McGuffey*, 954 F.2d 1337, 1344 (7th Cir.1992).

### B. *Use of Seat Belt Evidence*

Walsh's arguments regarding the use of seat belt evidence are his most subtle. Walsh does not fault the district court for allowing EO to present evidence that the unenclosed seating had seat belts. Indeed, Walsh concedes that EO could present this evidence to try to persuade the jury that, because the truck had seat belts in the unenclosed area, the truck was not unreasonably dangerous. Rather, Walsh faults the district court for allowing EO to present evidence of Walsh's *failure to use a seat belt for the purpose of showing that he was contributorily negligent or that he assumed the risk.*[1]

---

1. Specifically, Walsh contends that neglect of seat belts could be relevant only to assumption of risk. His brief states:

> The only place where the plaintiff's conduct is relevant in a products liability case is with respect to misuse, i.e., putting the product to some unforeseen use, or with respect to assumption of risk, i.e., using the product even though the plaintiff knows it is defective. Here, Judge Leinenweber struck the misuse

defense, but allowed defendant to argue assumption of risk.

Br.Aplt. at 13–14. We have no opinion as to whether Walsh accurately describes all of the potential uses of conduct evidence in Illinois strict product liability cases. Below we find only that, under Illinois law, evidence of Walsh's failure to wear a seat belt is admissible to show that he assumed the risk that resulted in his injury.

Contributory negligence, Walsh contends, has no place in the context of strict products liability and, in any event, Illinois statutes bar admission of evidence that a plaintiff failed to wear a seat belt to show the plaintiff's negligence. Assumption of risk, he contends, cannot be grounded on the failure to wear a seat belt because Walsh has alleged that EO made an unreasonably dangerous truck *even considering* the seat belts because EO knew that fire fighters do not wear them.[2]

█ We agree with Walsh that the failure to wear a seat belt does not provide a contributory negligence defense to strict products liability. For many years, contributory negligence has not been a bar to strict products liability. *Williams v. Brown Mfg. Co.,* 45 Ill.2d 418, 261 N.E.2d 305, 310 (1970). This principle remains intact even after *Coney v. J.L.G. Indus., Inc.,* 97 Ill.2d 104, 73 Ill.Dec. 337, 454 N.E.2d 197 (1983), which applied comparative fault, a negligence concept, in a strict liability context. *Id.* 73 Ill.Dec. at 342, 454 N.E.2d at 202.[3]

█ Product liability, however, was not Walsh's only theory; he also pleaded negligence.[4] Although the common law bar of contributory negligence no longer exists in Illinois, it has been replaced by "pure" comparative negligence, under which the plaintiff's damages are simply reduced in accordance with the percentage of fault attributable to him. *Alvis v. Ribar,* 85 Ill.2d 1, 52 Ill.Dec. 23, 34–35, 421 N.E.2d 886, 897–98 (1981). Like contributory negligence, then, comparative negligence requires the court to assess the extent to which the plaintiff's actions have helped cause his injury. The plaintiff's negligence is no longer a bar to recovery, but evidence of it is relevant to the calculation of damages under the negligence count. Therefore, even in a situation where EO referred in argument to the defunct con-

**2.** Walsh also argues that evidence of his failure to wear a seat belt should not have been admitted to prove assumption of risk based on *Clarkson v. Wright,* 108 Ill.2d 129, 90 Ill.Dec. 950, 483 N.E.2d 268 (1985). In *Clarkson,* the Illinois Supreme Court held that evidence of an automobile driver-plaintiff's failure to wear a seat belt was inadmissible in a negligence action for injuries sustained in a car accident. The court stated that the rule that "evidence of failure to wear a seat belt should not be admitted with respect to either the question of liability or damages, is a sound one and should be followed in this jurisdiction." *Id.* 90 Ill.Dec. at 952, 483 N.E.2d at 270.

Walsh's reliance on *Clarkson* is misplaced. *Clarkson* involved a negligence claim and this case—at least to the extent that it involves assumption of risk—involves a strict liability claim. In any event, *Clarkson's* reasoning supports the conclusion that Walsh's failure to wear a seat belt should limit his liability. The *Clarkson* court based its holding on the fact that the driver had no statutory or other duty to wear his seat belt and that his failure to wear the belt thus could not be considered a proximate cause of the accident. *Id.* 90 Ill.Dec. at 951–52, 483 N.E.2d at 269–70; *see also Brager v. Fee,* 750 F.Supp. 364, 366–67 (C.D.Ill.1990). Here, Walsh had a duty to wear a seat belt: the Department required that all firemen do so. Walsh's breach of this duty thus reinforces the notion that Walsh assumed the risk, such that it was not an abuse of discretion for the district court to allow EO to make that argument.

**3.** The *Coney* court stated that application of comparative fault principles in strict products liability cases would not frustrate the policies underlying strict liability, since "[t]he manufacturer's liability remains strict; only its responsibility for damages is lessened by the extent the trier of fact finds the consumer's conduct contributed to the injuries." 73 Ill.Dec. at 342, 454 N.E.2d at 202 (citing *Daly v. General Motors Corp.,* 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162, 1168 (1978)). But the *Coney* court excluded from the sort of plaintiff's conduct that could reduce recovery, "a consumer's unobservant, inattentive, ignorant or awkward failure to discover or guard against a defect." *Id.,* 73 Ill.Dec. at 344, 454 N.E. at 204. *But see Simpson v. General Motors Corp.,* 108 Ill.2d 146, 90 Ill.Dec. 854, 860, 483 N.E.2d 1, 7 (1985) (dissent) (opining that it is inconsistent to not consider the causative fault of all parties in apportionment of damages). The *Coney* formulation means that mere contributory negligence does not reduce damages in a strict liability case. For under *Coney,* Walsh's negligent failure to wear a seat belt could not be a factor in apportioning damages from violation of the alleged strict duty to make the truck seating safe.

**4.** Strangely, Walsh does not seem to be the only party overlooking his original negligence allegations on appeal. In EO's brief, for example, it distinguishes an earlier case involving seat belts from this one by commenting that the earlier case was "not a products liability case." Br.Appellee at 11. The jury, however, did not commit this apparent oversight, having returned verdicts for EO on both the negligence and strict liability counts.

**1422**

tributory negligence doctrine, the district court could still admit evidence of Walsh's negligent failure to wear a seat belt as relevant to apportionment of fault with respect to the negligence count.[5] Thus the district court did not err in allowing EO to present evidence of his failure to use a seat belt for the purpose of showing that he was contributorily negligent.

We also reject Walsh's claim that evidence of his failure to use a seat belt is inadmissible to prove assumption of risk. Illinois law recognizes the doctrines of express and implied assumption of the risk. *Duffy v. Midlothian,* 135 Ill.App.3d 429, 90 Ill.Dec. 237, 241, 481 N.E.2d 1037, 1041 (1985). In the context of product liability, Illinois courts have found that plaintiffs have assumed the risk where they have "voluntarily and unreasonably proceed[ed] to encounter a known danger." *Varilek v. Mitchell,* 200 Ill.App.3d 649, 146 Ill.Dec. 402, 411, 558 N.E.2d 365, 374 (1990). The test is subjective: the court must consider the state of mind of the particular plaintiff rather than that of a reasonably prudent person. *Id.* In order to "assume the risk" the plaintiff must have voluntarily and unreasonably used that aspect of the product that was alleged (and proven) to be

unreasonably dangerous. *Varilek,* 146 Ill. Dec. at 411, 558 N.E.2d at 374; *Cleveringa v. J.I. Case Co.,* 230 Ill.App.3d 831, 172 Ill.Dec. 523, 538, 595 N.E.2d 1193, 1208 (1992).

In his opening brief, Walsh complains that the district court failed to satisfy this last requirement. He argues that the "aspect" of the truck that renders it unreasonably dangerous is that it contains seat belts that EO knew firemen would not use, rather than being enclosed. Whether Walsh in fact used his seat belt, he insists, is irrelevant to this inquiry.

Walsh's argument reads the "rule" of *Cleveringa* and *Varilek* too literally. The rule requires us only to ask whether the risk assumed was the same risk as allegedly caused the injuries.[6] Thus, the fact that Walsh did not wear the provided seat belt was properly part of EO's argument that he assumed the risk—he was injured while riding in the unenclosed area which contained the seat belts the very non-use of which was integral to the truck's alleged defect.[7]

C. *Reliance on the City's Design Specifications*

EO had intended to argue at trial that its reliance on the City's specifications

---

5. It does not appear that the district court's handling of Walsh's alternative negligence and strict liability arguments was confusing or misleading to the jury. Only the jury instruction on the negligence count even mentions contributory negligence. R.O.A.Doc. 171 at 19. The instruction regarding the strict liability count discusses the plaintiff's contribution to his injury only in terms of assumption of risk. *Id.* at 14–16. The jury, of course, denied recovery on both the negligence and strict liability counts.

6. *Cleveringa,* for example, involved an underground cable installer who was injured when a trenching machine became entangled with his overly long shoelaces and dragged his leg into the machine's path. The installer sued the machine's manufacturer on a theory of product liability, alleging that the machine was unreasonably dangerous due to its lack of certain safety features. The unreasonably dangerous aspect of the machine (i.e., the moving parts that could catch on a cable installer's clothing) was the same as the aspect in which the installer allegedly assumed the risk, since the plaintiff could have worn other clothing "which would not have put him in danger of sustaining injury." 172 Ill.Dec. at 539, 595 N.E.2d at 1209.

7. We also note that, unlike the case before us, the products alleged to be unreasonably dangerous in *Varilek* and *Cleveringa* did not have safety devices which could have prevented the injury, so that the courts did not have to consider whether the plaintiff failed to use these devices. The defendant in *Varilek* alleged assumption of risk with respect to an aspect of the product wholly unrelated to the allegedly dangerous propensity of the product. Here, EO alleges assumption of risk with respect to safety devices installed for the express purpose of eliminating the alleged dangerous propensity of the product. Yet Walsh contends that the seat belts and the unenclosed seating are different "aspects" of the fire truck. Acceptance of this argument would undermine the policy of the assumption of risk defense, which is intended to determine "when a person's conscious decision to encounter an appreciated risk of harm should deprive him of recovery." W. Page Keeton et al., Prosser and Keeton on Torts § 79, at 566 (5th ed. 1984). In particular, following Walsh's approach would require us to disregard the plaintiff's conscious decision to encounter the known risk of using a product without also using the relevant safety devices provided.

was an affirmative defense, but the court ruled before trial that it would not allow this defense.[8] Walsh contends that, despite this ruling, the court nonetheless permitted EO to make this argument at trial.

We think that in fact EO was not permitted to argue, as a defense, reliance on the City's design specifications. Walsh pieces together a variety of references in the transcript to the City's purchase of Engine 61. He cites references where, in open court, witnesses indicated that the City had requested that the fire truck have a particular design, R. 19, that EO did not offer a design with more expensive enclosed seating because the City wanted to select the lowest bidder, R. 509, and that the City employee who ordered the truck was highly qualified and would not intentionally order an unsafe vehicle, R. 89–90, 105, 510, 559–61. However, the court allowed this testimony only to show how Engine 61 came to be used by the fire department and to indicate that EO was not negligent "because the truck was built in accordance with standards of the day." R. 475.

While some of the references gleaned by Walsh could, no doubt, be used to support a showing that EO relied as a defense on the City's design specifications, the references are more relevant to the purposes for which the testimony was allowed. Further, we think that these purposes (i.e., to show the origin of the truck and adherence to prevailing design standards) are distinct from showing that EO could rely on the City's design

specifications as a defense. There was no abuse of discretion here.

### D. Destruction of Fire House Journal

Walsh next argues that the court erroneously allowed the introduction of evidence suggesting that Walsh was involved in the destruction of a fire house journal that may have recorded some of the details of Walsh's accident. He insists that the evidence was more prejudicial than probative and therefore should have been excluded under Fed.R.Evid. 403. EO responds by arguing that the evidence introduced never in fact established that the journal was missing, and the jury was in any event never asked to draw an unfavorable inference. EO also contends that Walsh did not adequately object to the evidence that did come in.

The court apparently admitted evidence from which the inference Walsh describes could have been drawn,[9] though it excluded other such evidence.[10] In our view, the court did not allow EO to focus the jury's attention on the allegedly missing journal. And the evidence that *was* admitted (regarding the close relationship among fire fighters) could reasonably be understood as simply providing the jury with permissible background information. Indeed, while the testimony complained of by Walsh might possibly support his theory, it also could plausibly support the thesis for which EO purported to offer it: that, as a result of the "close knit" nature of the fire department, Walsh generally knew his superior officers. We therefore do not think that the district court—in

---

**8.** The district court rejected the reliance defense twice before trial. First, based on the statute of limitations, the court struck EO's third party contribution claim against the City of Chicago, which alleged that the City provided the specifications for Engine 61, such that EO could not be blamed for any fault in design. R.O.A.Doc. 118 at 5–6. Later, the court struck the same defense when EO raised it in moving for summary judgment, reasoning that the defense had never been posed as an affirmative defense against the plaintiff. Br.Aplt., App. B at 3. EO's reliance argument is an example of the so-called "government contract defense." *See, e.g., Boruski v. United States*, 803 F.2d 1421, 1429 (7th Cir.1986). Under Fed.R.Evid. 8(c), the argument was an affirmative defense and the court could appropriately bar it from trial because it had not been pleaded.

*See, e.g., Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 235 (7th Cir.1991).

**9.** In particular, certain testimony suggested that the journal was missing and referred to the fire department as a "small close knit family" where fire fighters "take care of each other." R. 354, 355. Walsh claims that this testimony allowed an unfavorable inference that he had been indirectly involved in destroying the journal; allegedly other fire fighters had destroyed the journal on Walsh's behalf.

**10.** In particular, the court refused to allow EO to call as a witness an assistant corporation counsel who participated in a meeting of fire fighters and officers associated with Engine 61, in which Walsh's accident was discussed.

allowing the fragments of evidence from which an unfavorable inference could plausibly be drawn—abused the wide discretion it has to weigh the probative and prejudicial aspects of this evidence under Rule 403. *See Littlefield,* 954 F.2d at 1342.

### E. Post–Manufacturing Standards

■ Walsh contends there was error in refusing to let him introduce recent industry standards (which were not in effect when Engine 61 was manufactured) calling for enclosed seating. In response to EO's motion in limine, the court ruled that Walsh could not present evidence of certain NFPA standards (referred to as the "1901 standards") which were adopted more than ten years after Engine 61 was made and sold. The court excluded this evidence because it felt that it was irrelevant, highly prejudicial and likely to confuse the jury. The court noted, however, that Walsh could offer direct evidence of the alleged dangerous condition known to exist in the fire service industry when the truck was manufactured. Further, the court ruled that, if EO's witnesses suggested that more recent safety standards had not eliminated hazards, Walsh could introduce evidence of such standards.

Walsh argues that the court's error in excluding evidence of the 1901 standards was compounded when the court allowed EO to impeach the credibility of one of Walsh's expert witnesses. The expert had been a member of the NFPA committee that developed the 1901 standards, where he argued for enclosure of fire truck seating. Walsh contends that EO was allowed to "ravage" this expert by pointing out that the City's fire chief (also a member of the NFPA committee) had rejected the expert's enclosure recommendation. EO also brought out that the expert was no longer a member of the prestigious committee and that the witness's recommendation regarding another safety standard was also ignored. Br.Aplt. at 20. Walsh complains that it was error for the

court to allow this impeachment while barring him, based on the court's exclusion of the subsequently enacted standards, from eliciting the fact that the witness's enclosure recommendation was ultimately incorporated into the 1901 standards. Walsh relies on *Murphy v. Messerschmidt,* 68 Ill.2d 79, 11 Ill.Dec. 553, 368 N.E.2d 1299 (1977), where the court held that subsequently enacted regulations were inadmissible to show industry standards. However, the *Murphy* court also indicated that subsequently enacted standards might be used to show that these standards corrected existing hazards in the industry. 11 Ill.Dec. at 556, 368 N.E.2d at 1302 (distinguishing *Davis v. Marathon Oil Co.,* 64 Ill.2d 380, 1 Ill.Dec. 93, 356 N.E.2d 93 (1976)).

Walsh accurately notes what might be referred to as the "hazard correction exception" to the general exclusion of subsequently enacted standards. He overlooks, however, the requirement, implicit in *Murphy,* that the party seeking to make use of this exception provide a sufficient foundation to show that the subsequent standard was, in fact, intended to eliminate existing hazards.[11] Walsh's response to EO's motion in limine to exclude the recent standards merely stated that the hazard correction exception applied. R.O.A.Doc. 157 at 5–6. Like the plaintiff in *Murphy,* he did not provide a copy of the subsequently enacted standards nor did he provide evidence that these standards were intended to correct the alleged hazards that resulted in Walsh's injury. We decline, as did the *Murphy* court, simply to infer that the subsequent standards corrected existing hazards.

It was therefore within the broad discretion of the trial court to have found that evidence of the 1901 standards was inadmissible. The court did allow evidence of dangerous conditions existing in the fire service industry when the truck was manufactured, as well as evidence that hazards existed de-

---

**11.** *See Murphy,* 11 Ill.Dec. at 556, 368 N.E.2d at 1302 ("Here, the record does not contain a copy of the [subsequently enacted] Code or ordinance, and we are unable to conclude, as did the *Davis* court, that either the Code or the ordinance was intended to eliminate existing hazards. We find, therefore, that plaintiff herein failed to establish the Code's relevancy, and that the trial court erred in refusing to sustain the defendant's objections to the Code's introduction and to its consideration by the jury ...").

spite compliance with current safety standards. Thus, the district court did not abuse its discretion in excluding evidence of the 1901 standards.

### F. Jury Instruction

■ Finally, Walsh argues that the district court erred when it gave the so-called "short form" of the Illinois Pattern Jury Instruction 15.01 rather than giving the Instruction's "long form." The short form provides:

> When I use the expression "proximate cause," I mean a cause which, in natural and probable consequence, produced the injury complained of.

R.O.A.Doc. 171 at 21; R. 661–63. The long form includes the language of the short form, to which is appended the following:

> It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.

Illinois Pattern Instruction 15.01. Walsh contends that the court's use of the short form left the jury with the impression that there could be only one proximate cause of his injury. Hence, the jury might not have understood that it could find EO liable even if it also found that Walsh bore some responsibility for his injury.

■ We review jury instructions to determine whether they provide a clear and adequate picture of the applicable law when viewed in their entirety, and any failure of one instruction to guide the jury properly on the issue of multiple proximate causes may

be cured by the guidance on this issue contained in other instructions. *Littlefield,* 954 F.2d at 1342; *National Sur. Corp. v. Fast Motor Serv., Inc.,* 213 Ill.App.3d 500, 157 Ill.Dec. 619, 625, 572 N.E.2d 1083, 1089 (1991); *Friedman v. Park Dist. of Highland Park,* 151 Ill.App.3d 374, 104 Ill.Dec. 329, 340, 502 N.E.2d 826, 837 (1986); *Friedman v. Park Dist. of Highland Park,* 151 Ill.App.3d 374, 104 Ill.Dec. 329, 340, 502 N.E.2d 826, 837 (1986). While use of the long form of Instruction 15.01 seems preferable (considering Illinois' adoption of comparative negligence) the suggested use of the short form remains discretionary in cases where there is only one plaintiff and one defendant. *Ostry v. Chateau Ltd. Partnership,* 241 Ill.App.3d 436, 181 Ill.Dec. 877, 880, 608 N.E.2d 1351, 1354 (1993); *Lewis v. Cotton Belt Route–St. Louis S.W. Ry. Co.,* 217 Ill.App.3d 94, 159 Ill.Dec. 995, 1012, 576 N.E.2d 918, 935 (1991).

Here, in addition to the short form of Pattern Instruction 15.01, the jury was given versions of Pattern Instruction 400.03.01, modified for assumption of risk and contributory negligence. In these other instructions, the jury was told what to do if it decided that Walsh's conduct and EO's conduct or product worked together to cause Walsh's injuries.[12] Walsh's argument that the jury would rely on the purportedly deficient short form to determine negligence and then rely on 400.03.01 only to determine damages is without merit. The instructions, taken together, adequately apprised the jury of the law as applied to the problem of proximate cause.[13] The jury was not misguided by the instructions in such a way that Walsh was prejudiced.

---

**12.** With respect to the strict products liability count, the court instructed the jury that:

> If you find that Plaintiff's injury was proximately caused by an unreasonably dangerous condition of the fire engine, and if you also find that the Plaintiff's assumption of the risk of his injury was less than 50%, you must then determine the amount of damages to be awarded by you as follows …

R.O.A.Doc. 171 at 15. With respect to the negligence count, the court instructed the jury that:

> If you find from your consideration of all the evidence that the Plaintiff has proved all the propositions required of him and that the Defendant has proved both of the propositions required of him, and if you find that the Plain-

tiff's contributory negligence was 50% or less of the total proximate cause of the injury or damage for which recovery is sought, then your verdict should be for the Plaintiff and you will reduce the Plaintiff's damages in the manner stated to you in these instructions.

R.O.A.Doc. 171 at 18.

**13.** Apparently, the district court believed that it was "mandate[d]" to use the short form because it believed that it could only give the long form if there were two defendants that might have contributed to Walsh's injury. R. 661–63. We continue to believe that while the long form may have been preferable, the short form was adequate in context.

## III.

For the foregoing reasons, the judgment of the district court is hereby AFFIRMED.